David **MARKS** and Karen Marks, Appellants,

v.

**NORTHERN INDIANA PUBLIC SERVICE COMPANY,**
Appellee.

No. 45A05–1011–CT–675.

Court of Appeals of Indiana.

Aug. 5, 2011.

Publication Ordered Sept. 2, 2011.

W.F. Conour, Timothy F. Devereux, Jeffrey A. Hammond, Conour Devereux Hammond, Indianapolis, IN, Attorney for Appellants.

Paul A. Rake, Louis W. Voelker, Eichhorn & Eichhorn, LLP, Hammond, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

David Marks ("David") and Karen Marks, collectively ("the Markses"), appeal from the Lake Superior Court's grant of summary judgment in favor of the Northern Indiana Public Service Company ("NIPSCO") in the Markses' negligence action against NIPSCO. On appeal, the Markses claim that the trial court erred in concluding that NIPSCO did not assume a duty to David.

We affirm.

### Facts and Procedural History

At the time relevant to this appeal, NIPSCO operated a generating station that produced electricity by using steam-driven turbines powered by coal-fired boilers. As a result of this process, coal ash is produced. This coal ash, also known as fly ash, is used in the production of concrete. On October 1, 2001, NIPSCO entered into a contract with ISG Resources, Inc. ("ISG") for the disposal and recycling of

fly ash at three of NIPSCO's generation facilities. On January 1, 2006, NIPSCO entered into an addendum to this contract. This addendum recognized that ISG had changed its name to Headwaters Resources, Inc. ("Headwaters") and called for Headwaters to construct a "Fly Ash Conditioning and Transfer System (FACTS)" at NIPSCO's Schahfer Generation Station.

Semi-tractor trailer trucks were used to move fly ash from one of the fly ash silos at NIPSCO's Schahfer Station. Headwaters therefore entered into a subcontract with MCS Trucking, Inc. ("MCS") to transport fly ash within the NIPSCO site from the NIPSCO fly ash storage silos to Headwaters's FACTS facility. One of MCS's truck drivers was plaintiff David Marks. David was assigned to a specific semi-truck and usually hauled the same trailer. The trailers were equipped with a fixed ladder running up the back, and had a rail along the top of each side of three hatch openings. The trailers were also equipped with a eighteen-inch strip of non-skid material between the hatches for the drivers to walk on.

To load the ash into his trailer, a driver such as David would drive his truck toward the silo, stop the truck in an open gravel-covered area, and climb to the top of the trailer to open a hatch in the middle of the trailer. The driver would then turn back toward the silo and drive underneath a hopper. There, a NIPSCO employee operating the hopper would signal the driver into position and guide a funnel from the hopper through the hatch. After the trailer was filled with ash, the driver would pull the truck away from the hopper, stop the truck again, climb back on top of the trailer, and close and secure the hatch.

On August 14, 2007, David drove his semi-tractor trailer to the Schahfer Station and drove up to a holding area to wait for the driver in front of him to load ash into his vehicle. David then climbed to the top of his trailer to open the hatch cover so that he would be ready when it was his turn to go under the hopper. When he got to the hatch cover, one of the hatch clips would not come loose. David then decided to retrieve his claw hammer so that he could pry the stuck clip. As he stood up to get the hammer, he slipped, hit his back on the trailer, and fell to the ground. David was injured as a result and received workers' compensation benefits from his employer.

On September 26, 2008, the Markses filed suit against NIPSCO and Headwaters. The Markses alleged, *inter alia*, that NIPSCO owed a duty to David and was negligent for failing to provide him with a safe work site, failing to establish and implement a safety protocol, failing to inspect the work site for hazards, failing to correct hazards, failing to comply with safety codes, and in failing to provide safety belts, harnesses, lanyards, and similar safety equipment. NIPSCO filed a motion for summary judgment on December 29, 2009. Headwaters filed a motion for summary judgment on January 4, 2010. After the Markses filed their response in opposition to summary judgment, the trial court held a hearing on June 2, 2010. On August 26, 2010, the trial court entered findings of fact and conclusions of law granting NIPSCO's motion for summary judgment, but denying Headwaters's motion for summary judgment. The Markses now appeal.

### Standard of Review

As stated our supreme court in *Dugan v. Mittal Steel USA Inc.*:

A party is entitled to summary judgment upon demonstrating the absence of any genuine issue of fact as to a determinative issue unless the non-moving party comes forward with contrary evidence showing an issue of fact for trial.

An appellate court reviewing a trial court summary judgment ruling likewise construes all facts and reasonable inferences in favor of the non-moving party and determines whether the moving party has shown from the designated evidentiary matter that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. But a *de novo* standard of review applies where the dispute is one of law rather than fact.

929 N.E.2d 184, 185–86 (Ind.2010) (citations omitted).

Where the trial court makes findings and conclusions in support of its entry of summary judgment, we are not bound by such findings and conclusions, but they aid our review by providing reasons for the trial court's decision. *Kumar v. Bay Bridge, LLC,* 903 N.E.2d 114, 115 (Ind.Ct.App.2009). If the trial court's entry of summary judgment can be sustained on any theory or basis in the record, we will affirm. *Id.*

The Markses' complaint alleged negligence, which is comprised of three elements: (1) a duty on the part of a defendant in relation to the plaintiff; (2) a breach of this duty, i.e., a failure on the part of the defendant to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff that was proximately caused by the defendant's breach. *Stumpf v. Hagerman Const. Corp.,* 863 N.E.2d 871, 875, 875–76 (Ind.Ct.App.2007) (citing *Merrill v. Knauf Fiber Glass GmbH,* 771 N.E.2d 1258, 1264 (Ind.Ct.App.2002)). Although we often say that summary judgment is rarely appropriate in a negligence action, a defendant may obtain summary judgment by demonstrating that the undisputed facts negate at least one element of the plaintiff's claim. *Id.* at 876 (citing *Merrill,* 771 N.E.2d at 1264).

Here, the parties argue over whether NIPSCO owed a duty to David. If NIPSCO owed no duty to David, there can be no negligence, and summary judgment in favor of NIPSCO would be appropriate. *See id.* (noting that the existence of a duty is a pure question of law for the court to determine and that, absent a duty, there can be no breach and no recovery for negligence).

### I. Assumption of Duty by Contract

The Markses first argue that the trial court erred in concluding that NIPSCO did not assume a duty of care to David by way of contract. In Indiana, it is well established that a employer does not have a duty to supervise the work of an independent contractor to assure a safe workplace. *Stumpf,* 863 N.E.2d at 876. As a result, a principal is not liable for the negligence of an independent contractor. *Id.; Merrill,* 771 N.E.2d at 1267. This is so because " 'a general contractor typically exercises little, if any, control over the means or manner of the work of its subcontractors, and requires only that the completed work meet the specifications of the owner in its contract with the general contractor.' " *Stumpf,* 863 N.E.2d at 876 (quoting *Harris v. Kettelhut,* 468 N.E.2d 1069, 1072 (Ind.Ct.App.1984)). This would also be true of any employer and a subcontractor.

There are, however, recognized exceptions to this general rule. One of these exceptions is where the principal is charged by law or by contract with performing the specific duty. *Id.* (citing *Merrill,* 771 N.E.2d at 1267). To determine whether a principal is charged with a duty of care under a contract, we look to the contract as a whole by examining all of its provisions. *Merrill,* 771 N.E.2d at 1268. In interpreting a written contract, we ascertain the intent of the parties at the time the contract was executed, as disclosed by

the language used to express their rights and duties. *Id.* Actionable negligence may be predicated upon a contractual duty only where the contract affirmatively evinces an intent to assume a duty of care. *Id.*

Here, the Markses refer us to several portions of the contracts between NIPSCO and Headwaters they claim demonstrate that NIPSCO did assume a duty to David. First, the Markses refer to provisions in the 2001 contract that pertain to Headwaters. Specifically, they quote portions of the contract that: (1) requires Headwaters to comply with the applicable laws in connection with the marketing of the ash and in the conduct of all activities related thereto, including storing, loading, and transporting the ash; (2) requires Headwaters to provide vehicles that are fully suitable for and have the requisite permits for the transportation of the ash; (3) places upon Headwaters the responsibility for any damage caused to public roads; (4) requires Headwaters to secure all vehicles to prevent dust emission when transporting ash; (5) requires Headwaters to provide all labor, supervision, and equipment, including trucking, supplies, tools, office support, and other personnel necessary to maintain silo levels and to market and dispose of the ash; (6) requires Headwaters to use NIPSCO's loading facilities to load its vehicles; (7) requires Headwaters to perform the contract with sufficient and competent personnel; and (8) requires NIPSCO's concurrence to replace lost personnel with those of equal or better skills. *See* Appellant's App. pp. 179–80. We can discern nothing from these provisions which would affirmatively show any intent by NIPSCO to assume a duty of care. Instead, these provisions quite clearly delegate any duty of care to the primary contractor, Headwaters, not NIPSCO.

The Markses also refer to other provisions of the 2001 contract that place certain responsibilities on NIPSCO. Specifically, under the contract it was NIPSCO's duty to notify Headwaters of any conditions which NIPSCO believed could impede or prevent loading of ash at any of the generating facilities. NIPSCO was also required to provide Headwaters access to NIPSCO's properties for the purposes of the contract. The contract further required NIPSCO to "use good faith efforts to ensure that [Headwaters] is able to load its vehicles with materials and that the vehicles will not be unreasonably delayed in any Generating Facility premises. Notwithstanding the foregoing, [Headwaters] vehicles shall be subject to and comply with all applicable procedures established by the Generating Facilities," which the Markses claim includes safety policies. *Id.* at 180–81. The contract also contains a provision that requires Headwaters to obtain NIPSCO's written approval before using a subcontractor and gives NIPSCO the right to approve any subcontractor. But "such approval, given by NIPSCO, shall not relieve [Headwaters] from full responsibility for the fulfillment of all obligations under this Contract." *Id.* at 187. This provision further states:

> *[Headwaters] shall be responsible for the acts, errors, and omissions of its subcontractors and of all persons employed by them.* If NIPSCO determines that any subcontractor is performing any work in a less than satisfactory manner, NIPSCO may notify [Headwaters] and [Headwaters] shall take immediate action to remedy such unsatisfactory work or cancel such subcontract. Subcontracting by any subcontractor shall be subject to the same requirements and provisions hereof.

*Id.* (emphasis added).

Again, we discern nothing from these contractual provisions which would even suggest, much less affirmatively demonstrate, that NIPSCO intended to assume a

duty of care with regard to the safety of Headwaters employees or the employees of Headwaters subcontractor, MCS. Indeed, the contractual language emphasized above appears to place a duty on Headwaters, not NIPSCO.

▆▆▆ The 2001 contract also contains a section concerning safety, which reads in part:

15. Safety and First Aid

a. ... [Headwaters] shall comply with all provisions of applicable federal and state occupational safety and health statutes and regulations and amendments thereto, and *shall indemnify NIPSCO, its officers, directors and employees from and against all liability for any violation of such laws and regulations. [Headwaters] shall take reasonable precautions to ensure the safety of all persons and property on or off NIPSCO's premises and to protect the public against injury to persons and property.*

b. All unsafe conditions created by, and all unsafe practices on the part of [Headwaters]'s employees shall be promptly reconciled by [Headwaters] and its subcontractors. *Neither [Headwaters] nor any of its subcontractors shall be relieved of any responsibility provided under this Article because NIPSCO has given any directive or has failed to detect or order the correction of any unsafe conditions or practices.*

c. If, in the opinion of NIPSCO, any part of the services to be provided by [Headwaters] pursuant to this Contract is not being executed in a safe manner as defined herein, NIPSCO may order [Headwaters] to stop providing such services immediately. And the services shall not be resumed until the proper methods have been employed by [Headwaters]. All equipment which, in the opinion of NIPSCO, is inadequate or unsafe shall be removed and replaced at the expense of [Headwaters].

d. Any accidents to persons or damage to property occurring directly or indirectly from or in connection with the performance of this contract shall be promptly reported by [Headwaters] to NIPSCO.

*Id.* at 191.

Yet again, we fail to see any language in these provisions affirmatively showing that NIPSCO was assuming any duty of care toward the safety of Headwaters or its subcontractors. To the contrary, the contract clearly places the duty on Headwaters to "ensure the safety of all persons and property." *Id.* The contract also clearly shows an intent that Headwaters and its subcontractors *not* be relieved of any responsibility based on NIPSCO's actions or inactions.

▆▆▆ The Markses also claim that the contract requires NIPSCO's subcontractors to comply with NIPSCO's safety rules. But we have held before that "the 'assumption by contract' exception to the general rule of nonliability is not triggered merely because [a contractor] may have a right to inspect and test the work, approve of the work and/or employees of the independent contractor *or require the contractor to follow company safety rules.*" *Armstrong v. Cerestar USA, Inc.,* 775 N.E.2d 360, 371 (Ind.Ct.App.2002) (quoting *Merritt v. Bethlehem Steel Corp.,* 875 F.2d 603, 604–05 (7th Cir.1989)) (brackets in original) (emphasis added).

Similarly, the requirement that Headwaters and its subcontractors follow applicable federal and state safety statutes and regulations is inadequate to establish the assumption of a duty by contract. "Our courts have refused to extend a specific duty to an owner where the contract merely prescribes safety rules and requires the independent contractor to observe those rules or any laws relating to safety." *Merrill,* 771 N.E.2d at 1269–70 (citing *Ryobi*

*Die Casting v. Montgomery,* 705 N.E.2d 227, 231 (Ind.Ct.App.1999); *Adams v. Inland Steel Co.,* 611 N.E.2d 141, 144 (Ind. Ct.App.1993)).

■■■ The Markses also refer to the requirement in the 2001 contract that Headwaters, and presumably its subcontractors, use NIPSCO's loading facilities. But we fail to see how this could possibly be construed as affirmatively evincing NIPSCO's intent to assume a duty of care toward Headwaters's or its subcontractors' employees.[1]

None of the contractual provisions, either individually or collectively, clearly evinces any intention that NIPSCO assume a duty of care toward Headwaters or its subcontractors or their employees. Accordingly, the general rule that the employer has no duty to assure a safe workplace for an independent contractor applies.

We therefore hold that the trial court properly concluded, as a matter of law, that NIPSCO owed no duty to David. *See Armstrong,* 775 N.E.2d at 371–72 (concluding that owner of mill did not contractually assume a duty of care to independent contractor's employee who was injured while removing sludge from owner's mill even though contract provided that contractor would obtain advice from owner's safety director as to safety regulations and agreed to conform thereto), *trans. denied; cf. Stumpf,* 863 N.E.2d at 877 (concluding that primary contractor did contractually assume duty of care to its subcontractor's employees where contract required contractor to "take all necessary precautions for the safety of employees on the work" and to comply with all state, federal, and local safety laws and codes to prevent acci-

dents or injury to persons on or adjacent to the premises, and required contractor to designate an agent whose duty it was to prevent accidents); *Perryman v. Huber, Hunt & Nichols, Inc.,* 628 N.E.2d 1240 (Ind.Ct.App.1994) (holding that contract charged primary contractor with a duty of care for all employees on the work site, including employees of its subcontractors, where contract required primary contractor to comply with applicable state and federal safety statutes and regulations, made primary contractor responsible for reviewing safety programs of its subcontractors, and primary contractor employed a safety officer to oversee its subcontractor's operations); *Cummings v. Hoosier Marine Props., Inc.,* 173 Ind.App. 372, 391, 363 N.E.2d 1266, 1277 (1977) ("The fact that the specifications require a contractor to take safety precautions does not impose a specific duty on the part of the owner to enforce the same.").

## II. Assumption of Duty by Conduct

■■■ The Markses also argue that NIPSCO assumed a duty toward David by its conduct. "A duty to exercise care and skill may be imposed on one who, *by affirmative conduct,* assumes to act, even gratuitously, for another." *Schlotman v. Taza Cafe,* 868 N.E.2d 518, 523 (Ind.Ct. App.2007) (emphasis added), *trans. denied; see also Merrill,* 771 N.E.2d at 1270 ("A duty of care may arise where a party gratuitously or voluntarily assumes a duty by conduct."). The actor must specifically undertake to perform the task he is charged with having performed negligently; without actual assumption of the undertaking there can be no corresponding legal duty to perform the undertaking

---

1. The same is true regarding the Markses' reference to NIPSCO's contractor information handbook ("CIH"). Those portions of the CIH the Markses refer to simply require contractors to follow job site rules, including NIPSCO's safety rules and state and federal requirements. This is insufficient to demonstrate that NIPSCO contractually assumed a duty of care. *See Merrill,* 771 N.E.2d at 1269–70.

carefully. *Schlotman,* 868 N.E.2d at 523. Thus, the assumption of a duty creates a special relationship between the parties and a corresponding duty to act in a reasonably prudent manner. *Id.*; *Merrill,* 771 N.E.2d at 1270. Although the existence and extent of an assumed duty are ordinarily questions for the trier of fact, a court will decide the issue as a matter of law when the record contains insufficient evidence to establish such a duty. *Id.*

Here, the Markses claim that NIPSCO assumed a duty through its various safety policies that contractors and subcontractors were required to follow. These requirements were listed in both the contractor information handbook ("CIH") and in a safety video. The video informed contractors that they were required to obey safety rules, wear safety gear, wear photo identification badges, read the CIH, and informed them that they could be subject to search and that failure to follow NIPSCO's rules could result in being banned from the premises. The CIH also required contractors to wear safety gear and follow applicable safety rules and regulations. It also required a safety orientation to be conducted by a designated employee of the contractor, not NIPSCO. The CIH also stated that contractors, subcontractors, and their employees, were required to be knowledgeable of NIPSCO's safety rules; that contractors would be evaluated based on their safety record; that NIPSCO and the contractors would hold safety meetings where safety issues would be discussed; and that NIPSCO would inspect work sites.

However, the Markses refer to no designated evidence demonstrating that NIPSCO, *by affirmative conduct,* specifically undertook a task vis-à-vis David and his truck, which it subsequently performed in a negligent manner. Having safety rules and requirements is insufficient without some affirmative conduct on the part of NIPSCO. *See id.* Here it appears that NIPSCO, although concerned with safety at its generating facilities, relied on its primary contractor, Headwaters, to ensure compliance with safety rules and procedures by Headwaters and its sub-contractors. Because NIPSCO did not assume any duty of care by conduct, the trial court did not err in granting summary judgment in NIPSCO's favor.

## Conclusion

The designated evidence does not establish that NIPSCO assumed a duty of care toward David either by way of contract or by way of conduct. Therefore, the trial court did not err in granting summary judgment in favor of NIPSCO.

Affirmed.

KIRSCH, J., and VAIDIK, J., concur.

## *ORDER*

Appellee, Northern Indiana Public Service Company, by counsel, filed an Appellee's Motion to Publish Memorandum Decision.

Having reviewed the matter, the Court FINDS AND ORDERS AS FOLLOWS:

1. The Appellee's Motion to Publish Memorandum Decision is GRANTED and this Court's opinion heretofore handed down in this cause on August 5, 2011, marked Memorandum Decision, Not for Publication in Now ORDERED PUBLISHED.

KIRSCH, VAIDIK, MATHIAS, JJ., concur.