**FOR PUBLICATION**



ATTORNEY FOR APPELLANT:

**ROBERT D. BROWN**
Kenneth J. Allen Law Group, LLC
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE:

**PAUL A. RAKE**
**ROBERT H. FELDT**
Eichhorn & Eichhorn, LLP
Hammond, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| ADAM NAGEL and EMILY NAGEL, )<br>)<br>Appellants-Plaintiffs, )<br>)<br>vs. )<br>)<br>NORTHERN INDIANA PUBLIC SERVICE )<br>COMPANY, )<br>)<br>Appellee-Defendant. ) | No. 45A03-1403-CT-103 |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable John R. Pera, Judge
Cause No. 45D10-0910-CT-188

**January 23, 2015**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Adam and Emily Nagel appeal the trial court's refusal to impose discovery sanctions against Northern Indiana Public Service Company ("NIPSCO") and the trial court's grant of summary judgment in favor of NIPSCO. We affirm in part, reverse in part, and remand.

**Issues**

The issues before us are:

I. whether the trial court properly refused to enter default judgment against NIPSCO for its purported delays in responding to the Nagels' discovery requests; and

II. whether there is any designated evidence to show that NIPSCO owed a duty to Adam and breached that duty in connection with his personal injury negligence action against NIPSCO.

**Facts**

We first relate the available facts and designated evidence regarding Adam's accident and resulting injuries in a light most favorable to the Nagels.[1] Bailly Generating Station is a NIPSCO-owned coal-fired power plant located in Chesterton. On April 8, 2008, Adam was employed by ThyssenKrupp Safway, Inc. ("Safway"). Emily was married to Adam at the time, but they have since divorced. NIPSCO had hired Safway to erect scaffolding attached to a cooling tower at the Bailly Generating Station in preparation for routine maintenance of the plant.

---

[1] Given the divergent standards of review for the trial court's challenged rulings, we note the following. We set out the underlying facts of Adam's accident and injury in a light most favorable to the Nagels as summary judgment non-movants. The procedural history of the case, including discovery, is set out in a light most favorable to the trial court's ruling denying the Nagels's motion for sanctions, given our abuse of discretion review of that decision.

In connection with construction of the scaffolding, Safway placed a parts rack nearby. Safway instructed a NIPSCO forklift driver where to place the parts rack. However, NIPSCO retained the general authority to direct contractors in their use of staging areas, and specifically it could have instructed Safway to move the parts rack if it believed its placement posed a safety hazard. Also, a NIPSCO project manager conducted daily walkthroughs of the site. Kurt Sangster, a NIPSCO project manager, would later state in a deposition that NIPSCO did not believe the parts rack was in an unsafe location.

Across the road from the cooling tower was a silo that collected fly ash, a byproduct of burning coal. Semi-tractors pulling tanker trailers frequently drove to the silo to collect fly ash and remove it from the site. The parts rack was placed a few feet away from a road that led to and from the fly ash silo. The road had no curb, and there was no barrier between the road and where the parts rack was located. Trucks removing fly ash from the silo would sometimes cross into the area where the parts rack was located, in part because of the narrow turning radius provided for entering or exiting the silo area. Aside from a stop sign at the entry to the plant, there were no traffic control signs on the Bailly Generating Station premises.

Adam was assigned to work as a "ground man" on the Safway scaffolding project. App. p. 1694. This meant that Adam was required to obtain parts from the parts rack and deliver them to the other individuals constructing the scaffold. On April 8, 2008, Adam was asked to retrieve a part from the parts rack. One of his co-workers saw Adam descend a ladder from the scaffolding catwalk but lost sight of him when he was about three feet from the ground. When Adam did not return with the part, his co-workers went looking

3

for him and found him face down on the ground, unconscious and severely injured, about twenty-six feet away from the ladder he would have descended. Adam's hard hat and safety glasses were strewn in different directions several feet away from him. Tire tracks were observed near the parts rack. No witnesses recalled seeing what had happened to Adam.

Adam's recollection of the event was that he descended the ladder, then walked to the parts rack to obtain the needed part. He described what happened next as follows:

> And then as I bent over to bend over towards the rack to look for the part, I caught out of the corner of my eye a glimpse of a truck tire passing behind me.
>
> And as I caught that glimpse of the truck tire—it was close. As I caught the glimpse of that truck tire passing behind me, I jumped up and tried to twist—I may have yelled something even—to get out of the way of this truck when I felt—I felt something striking me in the—you know, which I think was the deck of the trailer.

Id. at 1715-16. As a result of the incident, Adam was in a coma for six weeks and continues to suffer from serious mental and physical problems.

Later, it was determined that a semi-truck pulling a tanker trailer driven by Matt Hren was the only vehicle that could have been near the parts rack at the time of the incident. Hren was employed by Whitcomb Trucking ("Whitcomb") and Whitcomb owned the vehicle he was driving. Whitcomb, in turn, had leased both Hren and the vehicle to MCS Trucking on April 8, 2008. Hren had no recollection of that date and, thus, no recollection of having struck Adam.

4

The Indiana Occupational Safety and Health Administration ("IOSHA") conducted an investigation of the accident. IOSHA issued a report on June 2, 2008, closing the investigation because of a lack of evidence or witnesses as to how Adam had been injured. The report noted that, as a "ground man," Adam would not have been allowed to climb a scaffold, and "[n]o evidence shows if the employee was on the scaffold or if he just fell . . . ." Id. at 1052. The report also related a phone interview with Emily while Adam was in the hospital, in which she said "that she thought there was more damage to him then [sic] what could be had if he had just tripped and fell." Id. at 1051. It also related a statement by an EMS responder "that off the record they had thought that possibly someone hit Adam Nagel but like the accident, there was no evidence to prove this as happening." Id. at 1052.

The Nagels retained counsel on April 16, 2008, but they did not file a complaint against NIPSCO until October 12, 2009, for Adam's personal injuries and Emily's loss of consortium. In the complaint, the Nagels alleged, "On or about April 8, 2008, Adam was injured by a vehicle, a piece of equipment, and/or other instrumentality while working at Bailly Plant." App. p. 36. The Nagels specifically alleged that NIPSCO "[c]reated an unreasonably dangerous condition with respect to the vehicles, equipment, or other instrumentalities that were allowed to be used or employed at or very near the scaffold being erected by Safway . . . ." Id. The complaint also asserted that NIPSCO was liable to the Nagels by reason of res ipsa loquitur.[2] The complaint did not name any defendants

---

[2] The Nagels make no argument on appeal regarding res ipsa loquitur.

5

other than NIPSCO, nor did it state any claim that NIPSCO was vicariously liable for the negligence of any other party.

On January 8, 2010, the Nagels filed interrogatories and requests for production with NIPSCO. One of the interrogatories asked NIPSCO to "[p]rovide a complete description of all vehicles within the NIPSCO Plant on the date of the occurrence and identify any document reflecting such vehicles." Id. at 282 (emphases in original). The Nagels also asked NIPSCO to "produce any documents reflecting logs for vehicles within the NIPSCO Plant on the date of the occurrence by attaching copies thereof to your response to this discovery request." Id. at 281 (emphases in original). NIPSCO responded to this discovery request on March 31, 2010 as follows:

> Objection; NIPSCO does not know as a matter of law if Mr. Nagel was injured at Bailly Generating Station on April 8, 2008, and the Plaintiffs' Interrogatory No. 22 and related "definitions" improperly require NIPSCO to assume/admit this. The phrase "any documents reflecting such vehicles" also is vague, unduly-burdensome, undefined and not reasonably calculated to lead to the discovery of admissible evidence and constitutes proprietary information. However, and without waiving its objections, NIPSCO refers the Plaintiffs to its security checkpoint log attached to its Responses to the Plaintiffs' Requests For Production.

Id. at 282.

Meanwhile, on March 15, 2010, the Nagels had responded to an interrogatory from NIPSCO asking them to clarify the nature of their complaint and specifically how they claimed Adam had been injured. The Nagels generally referred NIPSCO to their complaint, as well as the IOSHA report of June 2, 2008, and gave no further details as to how they believed Adam had been injured. On October 20, 2010, the Nagels supplemented

6

their response to NIPSCO's interrogatories to state, "although Plaintiff has islands of memory about the events of that day, Plaintiff was working on and around the work site near the scaffolding and parts area when he was struck by a truck. Plaintiff was rendered unconscious and remains unaware of the identity of the vehicle's operator." Id. at 473. This was the first explicit claim by the Nagels that Adam's injuries had been caused by a truck.

The NIPSCO Security Log provided with NIPSCO's March 31, 2010 discovery response only reflected vehicles that entered the Bailly Generating Station premises with a pre-issued security card. Bulk carriers, including semi-truck drivers, such as Hren, with tanker trailers going to the fly ash silo, did not have security cards and were not reflected on the Security Log. Instead, such drivers went to a scale to have their vehicles weighed upon entering and leaving and received a weight ticket after doing so, which tickets also reflected the material that the trucks were carrying. Such tickets were reflected on a log, the Chronological Transaction Log, which is completely separate from the Security Log maintained by NIPSCO. The Chronological Transaction Log is maintained by an independent contractor, Apollo Security, which operated the weight ticket system.[3] NIPSCO produced this document to the Nagels on December 17, 2010 as a supplementary discovery response. The Chronological Transaction Log revealed that only one vehicle would have been in the vicinity of the fly ash silo at the time of Nagel's accident: a vehicle identified as M27W operated by a company named MCS. Id. at 801.

---

[3] Headwaters Resources, Inc., had a contract with NIPSCO to remove fly ash from the Bailly Generating Station silo for use in other products. It was Headwaters that contracted with MCS to remove the fly ash.

7

On June 17, 2011, Adam was deposed and related for the first recorded time that he recalled being hit by a truck on April 8, 2008. On October 13, 2011, NIPSCO provided an affidavit from Hren to the Nagels. In the affidavit, Hren identified himself as the driver of vehicle M27W on April 8, 2008. Vehicle M27W was a blue tractor pulling a silver-gray tanker trailer.

On November 3, 2011, the Nagels filed a motion for sanctions against NIPSCO, seeking default judgment for NIPSCO's alleged discovery violations. Specifically, the Nagels asserted in part that they had been prejudiced by NIPSCO's delay in providing information about vehicles at the Bailly Generating Station and Hren's identity as the driver of one of those vehicles. The trial court conducted a hearing on this motion on November 30, 2011. At the conclusion of the hearing, the trial court stated that NIPSCO had committed a discovery violation through its delay in identifying Hren and the trucking companies, but it declined to impose any sanctions because it found the Nagels had not proven they were prejudiced by that delay. The trial court conducted a second hearing to address the issue of prejudice on March 13, 2012. The Nagels contended they had been prejudiced by NIPSCO's discovery delays because they did not learn the identities of Hren, MCS, and Whitcomb until after the two-year statute of limitations for initiating a claim against them—April 8, 2010—had already passed. At the end of this hearing, the trial court stated it would not impose default judgment against NIPSCO but otherwise held the issue of sanctions under advisement.

NIPSCO subsequently moved for summary judgment. The trial court held a hearing on the matter on December 4, 2012. On February 28, 2014, the trial court entered two

orders.  The first was the trial court's refusal to impose any sanctions against NIPSCO for the purported discovery violations.  The second was the trial court's granting of NIPSCO's motion for summary judgment.  The Nagels now appeal.  Additional facts will be provided as necessary.

## Analysis

### I. Discovery Sanctions

We first address the Nagels' argument that the trial court should have entered default judgment against NIPSCO as a result of its delay in providing information from which Hren's identity could be derived.  The main thrust of the Nagels' claim is that NIPSCO should have provided the Chronological Transaction Log to them as part of its March 31, 2010 discovery response, from which Hren's identity and his employment by Whitcomb and MCS could have been derived.[4]  They further assert that they were prejudiced because they were precluded from timely filing suit against Hren, Whitcomb, and MCS by April 8, 2010 as a result of NIPSCO's failure to timely provide the Chronological Transaction Log.  See Ind. Code § 34-11-2-4(a) (providing two-year statute of limitations for personal injury lawsuits).

"A trial court has broad discretion in ruling on issues of discovery and in determining appropriate sanctions for failing to comply with a trial court's discovery order."  White-Rodgers v. Kindle, 925 N.E.2d 406, 411 (Ind. Ct. App. 2010).  We will

---

[4] The Nagels also mention alleged improper communications by counsel for NIPSCO with persons to be deposed prior to their depositions being taken.  We believe their argument regarding this alleged discovery violation lacks cogency as to how they were prejudiced or why sanctions against NIPSCO are warranted, and we will not address it.  See Weaver v. Niederkorn, 9 N.E.3d 220, 223 (Ind. Ct. App. 2014) (citing Ind. Appellate Rule 46(A)(8)(a)).

9

reverse a trial court's ruling regarding discovery sanctions only when the appealing party can show an abuse of discretion. Id. "An abuse of discretion occurs when a trial court reached a conclusion that is against the logic and effect of the circumstances before it." Id.

"The purpose of the discovery rules is to allow for minimal trial court involvement and to promote liberal discovery." Whitaker v. Becker, 960 N.E.2d 111, 115 (Ind. 2012). "'[C]oncealment and gamesmanship'" are no longer acceptable practices in our justice system. Id. (quoting Outback Steakhouse of Florida, Inc. v. Markley, 856 N.E.2d 65, 77 (Ind. 2006)). To further the purposes of liberal discovery, Indiana Trial Rule 37(B)(2)(c) permits a trial court to impose sanctions, up to and including default judgment, if a party fails to comply with an order compelling discovery. Id. "[T]he purpose of sanctioning discovery violations is 'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.'" Id. (quoting Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643, 96 S. Ct. 2778, 2781 (1976)). Under certain circumstances a trial court may impose default judgment "when a party failed to respond to discovery requests on time, the trial court granted an order to compel discovery, and the party violated the order to compel by failing to respond." Id. at 116.

Trial courts stand much closer to litigants than appellate courts, and thus they are better equipped to have a better sense of what sanctions, if any, are appropriate in the case of a discovery violation. Id. at 115. In determining the appropriateness of default judgment as a discovery sanction, there is a marked preference in Indiana for deciding disputes on their merits, "'especially in cases involving material issues of fact, substantial amounts of

10

money, or weighty policy determinations.'" Wright v. Miller, 989 N.E.2d 324, 328 (Ind. 2013) (quoting Charnas v. Estate of Loizos, 822 N.E.2d 181, 185 (Ind. Ct. App. 2005)). Courts should not apply an "overly formulaic approach" in deciding whether to impose the "drastic sanction" of default judgment in the case of a discovery violation. Id. If possible, trial courts should impose sanctions that have a minimal effect on the evidence presented at trial and should not impose sanctions at all if the circumstances indicate that sanctions would be unjust. Id. at 330. We presume that a trial court will act in accord with what is fair and equitable in each case. Id.

The Nagels face an uphill battle in attempting to convince us as an appellate court that the trial court should have imposed the draconian punishment of default judgment against NIPSCO. While some appellate opinions have reversed a trial court's decision to impose such a sanction—in light of the disfavor in which default judgments and involuntary dismissals are held—the Nagels have not cited and we have not found a single appellate opinion holding that a trial court was too lenient in refusing to order default judgment for a discovery violation. The Nagels have failed to convince us that theirs should be the first appellate case holding that a trial court abused its discretion in refusing to impose default judgment.

It appears to us that there was some obfuscation—not necessarily deliberate—by both parties during the course of discovery. Much of this stems from the fact that there were no witnesses to the incident that injured Adam, and his own memory of the event was clouded by his serious injuries. The original complaint did not specify the manner in which Adam was injured. In the Nagels's discovery response to NIPSCO on March 15, 2010,

11

they refused to give more specifics regarding the cause of Adam's injuries, despite NIPSCO's request to do so. Instead, they referred back to the original complaint, as well as the IOSHA report of the incident. That report, while suggesting in parts that Adam's injuries might not have been strictly related to a fall, indicated that there simply was not enough evidence to determine the cause of those injuries. It was not until October 2010 that the Nagels first clearly stated, in a supplementary discovery response, that Adam was hit by a truck. The first recorded statement that Adam was hit by a truck was made in June 2011, at Adam's deposition.

Thus, when NIPSCO submitted its discovery response of March 31, 2010, the importance of identifying every single vehicle on the Bailly Generating Station premises at the time Adam was injured was not as clear as it would later become. Also, the request for information regarding vehicles was just one of several dozen interrogatories and requests for production the Nagels had filed with NIPSCO. The Security Log, while incomplete, was the only vehicle log that NIPSCO directly possessed. The Chronological Transaction Log was in the hands of an independent contractor. In December 2010, approximately two months after the Nagels first clearly stated that Adam had been hit by a truck, NIPSCO voluntarily provided the Chronological Transaction Log to the Nagels as a supplementary discovery response. Even if, as the trial court found, NIPSCO could have been more prompt in providing discovery to the Nagels, the evidence most favorable to the trial court's refusal to enter sanctions is that that delay was the not the result of deliberate malfeasance or gamesmanship on NIPSCO's part as opposed to overlooking information

12

whose importance was not yet readily apparent, in response to a large and detailed discovery request.

To the extent the Nagels assert they suffered severe prejudice by NIPSCO's delayed discovery responses because they could not sue Hren, Whitcomb, and MCS as defendants, we note the following. The statute of limitations against Hren, Whitcomb, and MCS ran on April 8, 2010. The Nagels had received NIPSCO's discovery response just seven or eight days before that. Given the large volume of information and documents the Nagels requested and that NIPSCO provided, it is by no means a given that, even if NIPSCO had provided the Chronological Transaction Log at that time, the Nagels' attorneys would have tracked down and identified Hren, Whitcomb, and MCS as potentially liable parties and added them as defendants in this case before the running of the statute of limitations. Indeed, although the Nagels retained their current counsel on April 16, 2008, no suit was filed for another eighteen months, leaving only approximately six months for any other potentially liable parties to be identified through discovery.

Moreover, NIPSCO suffered prejudice of its own because of the late discovery of Hren, Whitcomb, and MCS as potentially liable tortfeasors. Although Indiana's Comparative Fault Act allows a defendant to assert that the damages of a plaintiff were caused in full or in part by a nonparty, the named defendant must affirmatively plead that defense. McDillon v. N. Indiana Pub. Serv. Co., 812 N.E.2d 152, 156 (Ind. Ct. App. 2004) (citing I.C. §§ 34-51-2-14 & 34-51-2-15), summarily aff'd in relevant part, 841 N.E.2d 1148, 1152 (Ind. 2006). The Comparative Fault Act also places deadlines upon assertion of a nonparty defense as follows:

13

A nonparty defense that is known by the defendant when the defendant files the defendant's first answer shall be pleaded as a part of the first answer. A defendant who gains actual knowledge of a nonparty defense after the filing of an answer may plead the defense with reasonable promptness. However, if the defendant was served with a complaint and summons more than one hundred fifty (150) days before the expiration of the limitation of action applicable to the claimant's claim against the nonparty, the defendant shall plead any nonparty defense not later than forty-five (45) days before the expiration of that limitation of action. The trial court may alter these time limitations or make other suitable time limitations in any manner that is consistent with:

(1) giving the defendant a reasonable opportunity to discover the existence of a nonparty defense; and

(2) giving the claimant a reasonable opportunity to add the nonparty as an additional defendant to the action before the expiration of the period of limitation applicable to the claim.

I.C. § 34-51-2-16. When service of a complaint occurs more than 150 days before the expiration of the statute of limitations, this statute "strikes a balance between providing a reasonable opportunity to the defendant to discover and assert a nonparty defense and providing a reasonable opportunity to the claimant to join the alleged nonparty before expiration of the statute of limitations." Kelly v. Bennett, 792 N.E.2d 584, 586 (Ind. Ct. App. 2003), trans. denied.

Here, the Nagels' complaint was served more than 150 days before the expiration of the statute of limitations. Thus, NIPSCO had to plead any nonparty defense no later than forty-five days before April 8, 2010; alternatively, the trial court could have extended this time limit to the extent it was consistent with allowing the Nagels to add the nonparty or nonparties as additional defendants within the statute of limitations. These time periods

14

have now long-since passed, and so there is no opportunity for NIPSCO to assert under the Comparative Fault Act that another person or entity—aside from Adam himself—is wholly or partially liable for the Nagels's damages. Although the Nagels suggest NIPSCO will be able to point a jury to Hren, Whitcomb, or MCS as missing parties in this case who are the ones responsible for Adam's injuries, it does not appear that the Comparative Fault Act will allow them to do so.[5] See McDillon, 812 N.E.2d at 156. In sum, we conclude the trial court did not abuse its discretion in refusing to impose sanctions against NIPSCO for its purported delay in making some discovery responses.

## II. Negligence—Summary Judgment

We now turn to the issue of whether the trial court properly granted NIPSCO's motion for summary judgment. First, we acknowledge that the trial court entered a detailed written order explaining its decision. It is well-settled that special findings are not required in summary judgment proceedings and, even if they are entered, they are not binding on this court on appeal. New Albany Historic Preserv. Comm'n, 965 N.E.2d 79, 84 (Ind. Ct. App. 2012). Also, we will affirm a grant of summary judgment upon any theory supported by the designated evidence, regardless of a trial court's stated theory. Henderson v. Reid Hosp. & Healthcare Servs., 17 N.E.3d 311, 315 (Ind. Ct. App. 2014). Such findings by a trial court can be helpful in our review, but they are not required. Id.

We review a granting of summary judgment de novo, reviewing the matter in the same way as the trial court. Hughley v. State, 15 N.E.3d 1000, 1003 (Ind. 2014). We will

---

[5] NIPSCO will be able to refer to Safway at trial for the limited purpose of addressing whether NIPSCO owed a duty of care to Adam, as discussed below.

15

affirm such a ruling only if, after drawing all reasonable inferences in favor of the non-moving party, the designated evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id. "'A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences.'" Id. (quoting Williams v. Tharp, 914 N.E.2d 756, 761 (Ind. 2009)).

A summary judgment movant bears the initial burden of demonstrating the absence of any genuine issue of fact on a determinative issue. Id. If the movant does so, the non-movant then bears the burden of coming forward with contrary evidence showing an issue for the trier of fact. Id. We must carefully review a grant of summary judgment to ensure that a party was not improperly denied its day in court. Id.

In Hughley, our supreme court recently reaffirmed and emphasized the fact that it is more difficult to obtain summary judgment in Indiana courts than in federal courts. "In particular, while federal practice permits the moving party to merely show that the party carrying the burden of proof lacks evidence on a necessary element, we impose a more onerous burden: to affirmatively 'negate an opponent's claim.'" Hughley, 15 N.E.3d at 1003 (quoting Jarboe v. Landmark Cmty. Newspapers of Ind., Inc., 644 N.E.2d 118, 123 (Ind. 1994)). Summary judgment is not the same thing as a summary trial, and summary judgment is not appropriate simply because it appears the non-movant is unlikely to succeed at trial. Id. at 1004. "In essence, Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious

16

claims." Id. A non-movant only needs to demonstrate the existence of a "genuine" issue of material fact—not necessarily a "persuasive" one. Id.

The Nagels' claim against NIPSCO is based on negligence. In order to prove a negligence claim, a plaintiff must show that: (1) the defendant owed plaintiff a duty; (2) it breached the duty; and (3) plaintiff's injury was proximately caused by the breach. Winfrey v. NLMP, Inc., 963 N.E.2d 609, 612 (Ind. Ct. App. 2012). "Summary judgment is rarely appropriate in negligence cases because they are particularly fact sensitive and are governed by a standard of the objective reasonable person, which is best applied by a jury after hearing all the evidence." Id. Regardless, summary judgment may be granted to a defendant if the undisputed material evidence negates one element of a negligence claim. Id.

The arguments of the Nagels and NIPSCO primarily revolve around whether NIPSCO owed a duty to Adam. NIPSCO asserts that it did not owe a duty of care to an employee of an independent contractor working on its premises. The Nagels advance a variety of theories under which they claim NIPSCO owed Adam a duty. Most of those theories, however, are irrelevant to this case or unavailing. For instance, the Nagels acknowledge the general rule that a principal is not liable for the negligence of an independent contractor, but assert NIPSCO is liable for Adam's injuries because of one of five exceptions to that general rule. See Walker v. Martin, 887 N.E.2d 125, 134 (Ind. Ct. App. 2008), trans. denied. The Nagels' complaint, however, states no claim that NIPSCO is vicariously liable for the negligence of an independent contractor or any other third party, such as Safway, Hren, Whitcomb, or MCS; rather, the complaint focuses solely upon

17

NIPSCO's own alleged negligence in connection with the Bailly Generating Station worksite. In such a case, the rules regarding principal liability for independent contractor negligence are inapplicable, and we need not address those rules. See Beta Steel v. Rust, 830 N.E.2d 62, 69-70 (Ind. Ct. App. 2005).

Secondly, the Nagels argue that NIPSCO assumed a duty to Adam by virtue of its contract with Safway and other related documents, which contained various provisions related to worksite safety. However, as noted by NIPSCO, we previously addressed these very documents in another case involving injury to an employee of a NIPSCO subcontractor at a power plant and directly held that these documents were insufficient as a matter of law to establish that NIPSCO had assumed a duty of care to the injured employee, either by contract or by conduct. See Marks v. N. Indiana Pub. Serv. Co., 954 N.E.2d 948 (Ind. Ct. App. 2011). That holding also establishes here that NIPSCO's contract with Safway and other safety-related documents did not create a duty to Adam.

Marks, however, does not give a final answer in this case as to whether NIPSCO owed Adam a duty of care. Like here, Marks also concerned a personal injury accident at a NIPSCO plant related to a fly ash removal truck. In that case, however, unlike the present case, there was no premises liability issue, as we noted in our opinion on rehearing. Marks v. N. Indiana Pub. Serv. Co., 964 N.E.2d 238, 239 (Ind. Ct. App. 2011). The plaintiff—a driver of a fly ash removal truck—was injured when he fell while trying to open the hatch on top of his tanker trailer. The injury had no relation to the condition of the land. See id.

Here, the Nagels have argued and presented evidence that Adam's injuries were at least partially related to a condition of the land owned by NIPSCO. As such, we now turn

18

to the question of premises liability. Although a property owner has no duty to provide an independent contractor with a safe place to work, there is a common law duty to keep the property in a reasonably safe condition. Zawacki v. U.S.X., 750 N.E.2d 410, 414 (Ind. Ct. App. 2001), trans. denied. This duty extends to employees of independent contractors. Id. Landowners also generally owe a duty to warn independent contractors and their employees of latent or concealed perils on the premises. Id.

A landowner's duty to employees of independent contractors is the same as that generally owed to business invitees on the property. Ooms v. USX Corp., 661 N.E.2d 1250, 1252 (Ind. Ct. App. 1996), trans. denied, overruled on other grounds by Smith v. Baxter, 796 N.E.2d 242, 245 (Ind. 2003). That duty is reflected by Section 343 of the Restatement (Second) of Torts, which Indiana has adopted and which reads:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Countrymark Coop., Inc. v. Hammes, 892 N.E.2d 683, 688 (Ind. Ct. App. 2008), trans. denied. This language should be read in conjunction with section 343A(1) of the Second Restatement, which provides: "A possessor of land is not liable to his invitees for physical

19

harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." Id. at 688-89.

Ultimately, the question of duty in premises liability cases comes down to whether the defendant was in control of the premises when and where the accident occurred. McCraney v. Gibson, 952 N.E.2d 284, 288 (Ind. Ct. App. 2011) (quoting Yates v. Johnson County Bd. of Comm'rs, 888 N.E.2d 842, 847 (Ind. Ct. App. 2008)), trans. denied. This rule is meant to impose liability upon the party who could have known of any dangers on the land and could have acted to prevent any foreseeable harm. Id. (quoting Beta Steel, 830 N.E.2d at 70). Although duty usually presents a question of law, whether a duty exists in premises liability cases may depend upon resolution of underlying facts by the trier of fact, including questions regarding who controlled the property at the time and place of an accident. Id. (quoting Yates, 888 N.E.2d at 847); see also Rhodes v. Wright, 805 N.E.2d 382, 386 (Ind. 2004) (holding there was genuine issue of material fact to be decided by jury as to who controlled property at time and place of accident for purposes of premises liability duty). Whether there has been possession and control of property for premises liability purposes is dependent upon occupation and intent to control the particular area where an injury occurred. McCraney, 952 N.E.2d at 288. "'Actual physical possession of property at the precise moment an accident happens is not always dispositive on the question of control for premises liability purposes, if there was evidence that another party was in a better position to prevent the harm that occurred.'" Id. (quoting Yates, 888 N.E.2d at 848).

20

We believe this case bears substantial similarities to Rhodes. In that case, an employee of Tyson Foods was killed on a chicken farm owned by the Wright family. The Wright family was under contract with Tyson to farm and raise chickens; Tyson employees periodically would come onto the farm to collect and haul away chickens. The death occurred at 3:00 a.m. while the decedent was attempting to collect chickens at the farm and another Tyson employee backed a forklift into the decedent, pinning him between the forklift and a trailer. The estate of the decedent sued the Wright family, asserting it had been negligent in failing to provide proper lighting at the chicken farm and in failing to warn of dangers on the property, and that such failures contributed to the decedent's death.

On appeal, the Wright family attempted to argue that they owed no duty to the decedent because they had ceded control of the property to Tyson at the time and place of the accident, in order to collect chickens, and because they had no control over how Tyson performed its work. Our supreme court rejected this argument and held there was a question of fact as to whether the Wright family owed the decedent a duty. Rhodes, 805 N.E.2d at 386. It found the evidence to be conflicting as to whether Tyson or the Wright family controlled the premises when and where the accident occurred. Id. Additionally, the court noted that the lighting on the farm was exclusively under the control of the Wright family, not Tyson, and there was designated evidence that the lack of lighting may have contributed to the accident. Id. at 386-87. The court further held that there was a question of fact as to whether the danger caused by the lack of lighting was obvious and, even if it was obvious, whether the Wright family still was obligated to take some action to alleviate foreseeable harm. Id. at 387-88. The court also found disputed evidence as to whether the

21

decedent had superior knowledge of the harm caused by the lack of lighting and whether the lack of lighting was the proximate cause of the decedent's death. Id. at 388. Thus, the court held that the Wright family was not entitled to summary judgment "in such a hasty manner." Id.

The Nagels' theory of this case, as supported by designated evidence viewed in a light most favorable to them,[6] can be paraphrased as follows: Safway may have made the initial decision as to where the place the parts rack, but NIPSCO still retained control over the property such that it could have approached Safway and demanded that it move the rack farther away from the road, in light of the danger posed by large semi-trucks frequently driving off the road in the vicinity of the rack and a lack of barriers between the road and the worksite. A NIPSCO project manager walked the grounds daily and could have noted the parts rack's unsafe location. Thus, although NIPSCO may have had no control over how Safway erected its scaffolding, it did retain control over staging of the work area. Most crucially, it retained the ability to tell Safway to move the parts rack to a different location. In granting summary judgment and finding NIPSCO owed no duty to Adam, the

---

[6] There are some discrepancies and inconsistencies in the evidence as noted by NIPSCO, including the fact that Hren does not recall having struck Adam with his truck and that Adam recalled the truck that struck him as being white, while the M27W truck Hren was driving was mostly blue with some white lettering. Such discrepancies are for a jury to address. NIPSCO also takes issue with statements of an accident reconstruction expert hired by the Nagels indicating that Adam's injuries were consistent with being hit by a truck and other statements implicating poor road design and traffic control and unsafe placement of the parts rack as factors in the accident. These arguments by NIPSCO require weighing of the evidence. Particularly given the Hughley case's recent emphasis on Indiana's preference for avoiding summary judgment and the deference to be given to evidence designated by a non-movant, we reject NIPSCO's arguments.

22

trial court's order indicates that it considered only Safway's initial placement of the parts rack and failed to consider NIPSCO's ability to demand that it be moved.[7]

Moreover, there is designated evidence that Adam was indeed struck by Hren's truck, and that the placement of the parts rack, combined with poor design of the roads and turnaround area in the vicinity of both the parts rack and fly ash silo, were contributing factors to that accident. NIPSCO, not Safway, had control over the road design and traffic flow at the Bailly Generating Station. Here, as in Rhodes, whether Safway or NIPSCO was in control of the premises when and where Adam was injured is unclear and must be resolved by a jury. Furthermore, just as the Wright family in Rhodes had exclusive control over a factor that may have contributed to injury—the lighting on the farm—NIPSCO had exclusive control over the roads and traffic flow on its premises, which may have been a factor contributing to Adam's injuries.[8] We conclude there are genuine issues of material fact regarding whether NIPSCO owed a duty of care to Adam. Granting summary judgment to NIPSCO on the basis of lack of duty was improper.

---

[7] NIPSCO employees Kurt Sangster and Dwayne Hogan and Safway employee Martin McCarthy all indicated in depositions that NIPSCO retained ultimate control regarding worksite locations by independent contractors, including the location of the Safway parts rack.

[8] NIPSCO's control over traffic and its ability to demand that Safway move the parts rack to a safer location also distinguishes this case from Pelak v. Indiana Indus. Servs., Inc., 831 N.E.2d 765 (Ind. Ct. App. 2005), trans. denied. In that case, we held that "where an instrumentality causing injury was in the control of an independent contractor, a duty will not be found where there is no evidence that the landowner maintained any control over the 'manner or means' by which the contractor engaged in its work." Pelak, 831 N.E.2d at 780-81. Here, there is evidence NIPSCO did have control over possible causes of Adam's injuries, even if it had no control over how Safway constructed its scaffolding.

There also is a question of fact in this case as to the issue of the obviousness of the danger of having the parts rack so close to the road near the fly ash silo. Under the Comparative Fault Act, "[t]he comparative knowledge of a possessor of land and an invitee regarding known or obvious dangers may properly be taken into consideration in determining whether the possessor breached the duty of reasonable care under Sections 343 and 343A of the Restatement (Second) of Torts." Smith v. Baxter, 796 N.E.2d 242, 245 (Ind. 2003). The standard for determining whether there has been a breach of duty with respect to an allegedly obvious danger is: (1) whether the landowner knew or by the exercise of reasonable care would have discovered the dangerous condition and should have realized that it involved an unreasonable risk of harm to invitees; (2) whether the landowner should have expected that an invitee would fail to protect him- or herself from the danger; and (3) whether the landowner failed to exercise reasonable care to protect the invitee. See Countrymark, 892 N.E.2d at 691. There is no requirement that an invitee's conduct in the face of a known or obvious risk be undertaken for "compelling circumstances." Baxter, 796 N.E.2d at 245. "Whether a landowner has superior knowledge goes to the question of breach, not of duty, and it is one factor among many used to determine if there was a breach." Rhodes, 805 N.E.2d at 388. Additionally, even if a landowner is not negligent for failing to warn an invitee of a dangerous condition, it still may be negligent for failing to take reasonable precautionary measures to reduce the danger. See id.

NIPSCO essentially asserts that Adam should have been well aware of the dangers of working in close proximity to a road traveled by large semi-trucks. Even so, that does

24

not automatically absolve NIPSCO of liability. First, Adam had to frequently walk in the vicinity of the parts rack as a necessary part of his job; NIPSCO could have reasonably expected that Adam or any Safway employee would frequently walk in the vicinity of the parts rack. Second, Adam's ability to hear and avoid oncoming traffic was reduced by his having to wear hearing protection as part of his job. Third, there is evidence NIPSCO did in fact have superior knowledge regarding the dangerous placement of the parts rack, because trucks often drove off the road in the area where the parts rack was placed; as an independent contractor not frequently on the premises, Adam would have been less aware of this situation, if he was aware of it at all. Finally, even if the danger here was obvious, it is a question of fact as to whether NIPSCO could or should have done more to reduce the danger, i.e., by directing Safway to move the parts rack to a safer location and/or by instituting better road design or traffic control methods, at least while Safway's work in the vicinity of the fly ash silo was ongoing. NIPSCO was not entitled to summary judgment on the basis that the danger here was allegedly obvious and thus there was no breach of duty to Adam.[9] The Nagels are entitled to bring their claims to trial.

## Conclusion

The trial court did not abuse its discretion in refusing to sanction NIPSCO with default judgment for its purported delays in providing discovery to the Nagels. However, the trial court erroneously granted summary judgment to NIPSCO. There are genuine

---

[9] NIPSCO makes no argument regarding proximate cause.

issues of material fact as to whether NIPSCO owed Adam a duty of care and whether it breached that duty. We affirm in part, reverse in part, and remand for further proceedings.

Affirmed in part, reversed in part, and remanded.

MAY, J., and PYLE, J., concur.