FILED

Apr 21 2016, 8:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Nelson D. Alexander
Darren A. Craig
Jenai M. Bracket
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Ralph E. Sipes
Anderson, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Alexin, LLC,<br>*Appellant-Plaintiff,*<br><br>v.<br><br>Olympic Metals, LLC,<br>*Appellee-Defendant.* | April 21, 2016<br><br>Court of Appeals Case No.<br>90A02-1510-CT-1608<br><br>Appeal from the Wells Circuit<br>Court<br><br>The Honorable Kenton W.<br>Kiracofe, Judge<br><br>Trial Court Cause No.<br>90C01-1307-CT-9 |

**Najam, Judge.**

## Statement of the Case

Alexin, LLC ("Alexin") appeals the trial court's judgment in favor of Olympic Metals, LLC ("Olympic") on Olympic's counterclaim seeking attorney's fees under Indiana Code Section 34-52-1-1(b). Alexin presents a single issue for our review, namely, whether the trial court abused its discretion when it awarded

Olympic attorney's fees. Olympic cross-appeals and requests appellate attorney's fees. We conclude that the trial court did not abuse its discretion when it awarded Olympic attorney's fees, and we deny Olympic's request for appellate attorney's fees.

We affirm.

## Facts and Procedural History

Alexin is a manufacturer of aluminum extrusion ingots in Bluffton. Olympic is an aluminum scrap broker located in Florida. In March 2013, Anita Eads, an Alexin employee, communicated with Cecil Shiver, a sales representative for Olympic, regarding Alexin's desire to purchase a shipment of aluminum scrap. On April 15, Alexin issued Purchase Order No. 16208 ("the purchase order") to Olympic requesting delivery of 40,000 pounds of "2XXX Series Aluminum Scrap"[1] for $33,800. Appellant's App. at 292. Alexin specified in the purchase order that the "[m]aterial will be 2024 sheets with thin paper in between." *Id.*

On April 25, Olympic delivered 40,643 pounds[2] of aluminum sheets and extrusions to Alexin to fill the purchase order. The shipment consisted of the following: 26,478 pounds of 2024 aluminum sheets; 5,155 pounds of 2024 extruded aluminum; and 8,060 pounds of 2090 aluminum sheets. Each of the three types of aluminum included in the shipment was clearly stamped as 2024

---

[1] Series 2XXX aluminum scrap comes in different alloys, including 2024 and 2090.

[2] This total weight included the weight of the pallets.

or 2090, and the various types of aluminum scrap were segregated onto separate pallets. The purchase order and bill of lading stated that only 2024 aluminum was being delivered, but a handwritten note provided to the Alexin clerk who received the shipment, Remington Steele, stated that part of the shipment was 2090 aluminum. Steele stamped "Received" on the purchase order, bill of lading, and handwritten note, and he signed his name to each stamp under the word "Received." *Id.* at 229-31.

[5] On May 29, Alexin melted down some of the aluminum scrap that Olympic had shipped on April 25.[3] The resulting batch of aluminum ingots had to be "scrapped" because of poor quality. *Id.* at 243. On May 30, Tom Horter, Alexin's CEO, sent an email to other Alexin employees, including Kevin Ferguson, that stated the following:

> We had to scrap another cast last night for high Li[thium]. We have found the culprit which is alloy 2090 sheet that is in the 2XXX series bin. We have segregated this bin for now until it can be sorted. The scrap is a unique sheet that is very brittle (2%

---

[3] Alexin explains its ingot manufacturing process as follows:

> Alexin's recycling process consists of essentially two stages. First, scrap aluminum is melted down in Alexin's primary furnace to create a molten state. Second, alloying elements are added to the molten aluminum scrap in a separate furnace to produce a given alloy for customer use. The chemical formulation involved varies depending on the type of scrap (i.e., the particular alloy) and the end customer's specifications. It is essential that the scrap alloy meet specifications, as the proper metallurgy for the end product depends on the integrity of the melted scrap.

Appellant's App. at 38-39.

or so Li[thium]) and has a shiny "aluminum-like" side and a darker gray side.

Kevin, this may have been purchased simply as a 2XXX series package or part of one and if so can very well be in compliance with our [purchase order], but nonetheless we should try to find out from whom we bought it. Also, for all future 2XXX series scrap purchases, we will need to add a note that alloy 2090 cannot be included in the package. There may be others too and I will get you that list. For now, we will just have to fight through the next few charges to get it down.

Appellant's App. at 243-44.

[6] On June 4, Shiver emailed Eads and requested payment for the April 25 shipment. In response, Eads replied as follows:

I was out of the office due to an illness since we last spoke. The material we discussed last week, 2024 sheet material purchase order, also included 2090 sheet. Please see attached pictures of the 2090 sheets that were sorted from the shipment. *It is stamped directly on the sheets "2090."* This material has High Li[thium] and is not usable by Alexin. *We have what material we sorted out placed on pallets. The Alexin management team would like Olympic Metals to pick up the remaining material.* Please review the pictures and let's discuss. I am waiting [for] someone to weigh the material sorted. Once I have that information, I will provided [sic] that to you as well.

*Id.* at 236 (emphases added). At some point, "[s]omeone at Alexin" told Shiver that Alexin had melted some of the 2090 aluminum in its furnace, which had "caused damage to its furnace by contaminating it[] and resulted in charges and fees associated with its furnace." *Id.* at 224. But Alexin's maintenance

manager, Scott Evans, told Shiver that Alexin's furnaces "were not damaged during [the relevant] period" of time. *Id.* Accordingly, on June 12, Shiver sent the following email to Ferguson:

> With all due respect, the commercial agreement in Alexin's terms and conditions does not address the issue of Alexin's responsibility with regards to quality control, segregation[,] and prior acceptance of material received.
>
> Regrettably, Alexin placed material in the furnace that resulted in a loss to conformity. We are not disputing that we did not ship [sic] 2090 material and in fact we are stating that Alexin signed for and issued a settlement confirmation based on a clearly marked packing slip that all the material was acceptable. *There was no attempt to ever mislead Alexin or hide the material. If the material was not acceptable, then the first course of action should have been to reject the undesirable material and contact Olympic Metals.* The burden lies with Alexin and its employees to inspect and approve all shipments into Alexin's facility. To this point, Olympic Metals is in position [sic] of all the supporting documents that the load was accepted. To complicate this issue further, the material was not even segregated by load and was mixed and/or blended with other material from multiple Alexin vendors making it more difficult to determine the actual source of nonconforming material.
>
> In addition, Olympic Metals continues to seek compensation for the past due amount owed on the load delivered.
>
> However, *Olympic Metals will accept rejection of the 8,060 lbs. of the 2090 material if Alexin so chooses.* Olympic Metals would then revert to the supplier for reconciliation which is standard practice in the industry.

*Id.* at 241-42 (emphases added).

[7]    On July 1, 2013, Alexin filed a complaint against Olympic in the United States District Court for the Northern District of Indiana alleging breach of express warranty, breach of implied warranty of fitness for a particular purpose, and breach of implied warranty of merchantability and seeking damages of $91,518. The next day, American Metal Market ("AMM"), an industry publication, reported on Alexin's lawsuit as follows:

> A dispute between an aluminum billet producer and a scrap broker over a truckload of scrap has escalated to the legal system, much to the surprise of the broker.
>
> Bluffton, Ind.-based Alexin LLC filed a lawsuit July 1 in [the] U.S. District Court in Indiana against Miami-based Olympic Metals LLC alleging breach of contract—a claim that Olympic Metals said it strongly denies.
>
> Alexin said in court documents that it ordered 40,000 pounds of 2024 aluminum scrap in April, but claimed that the 37,195 pounds delivered by Olympic Metals also included some lithium-containing 2090 alloy scrap.
>
> "Alexin melted down the 2024 aluminum that Olympic Metals had supplied. After adding pure aluminum and otherwise finished the product, Alexin noted that the finished aluminum ingots had an unacceptable and unsalable surface condition," Alexin alleged in the lawsuit. "Emergency investigation and analysis revealed that the unsalable ingots contained excessive levels of the element lithium. As a result of the lithium contamination, the ingots were worthless and were scrapped." Alexin estimated its total damages at $91,518.
>
> * * *

When contacted July 2, Christos Gorgias, managing director of Olympic Metals, said the company was unaware of Alexin's legal filing. "We filed a demand letter for payment after Alexin went past the payment date. Following that, we even requested mediation, which they did not accept. We had no idea they sued us and we will fight these allegations with documents that prove we are not in breach," he told *AMM*.

Gorgias said that Olympic Metals delivered about 29,000 pounds of 2024 alloy scrap and 8,000 pounds of 2090 scrap in segregated lots. "If they didn't want the 2090 scrap, they could have let us know and we would've taken it back. In any case, I don't know how it could cause damage when the scrap was segregated," he said.

Olympic Metals' June 20 letter to Alexin demanding payment— sent by a Miami law firm—included a shipping order detailing the different loads of 2024 and 2090 scrap, and noted that "the scrap was inspected, accepted and, to our understanding, consumed by Alexin."

Alexin's counsel did not respond to a request for comment, while a company spokesman said July 2 that Alexin had no further comment other than to say Olympic Metals "just didn't ship what was ordered and they need to come clean about it as most people usually do."

*Id.* at 72.

[8] After the federal court issued an order "rais[ing] doubt about" the court's jurisdiction, Alexin filed a complaint in the Wells Circuit Court and voluntarily dismissed the federal lawsuit. Appellant's Br. at 4. Olympic filed an answer and asserted affirmative defenses, including failure to state a claim upon which relief can be granted. In a counterclaim, Olympic sought attorney's fees under

Indiana Code Section 34-52-1-1(b) on the grounds that Alexin had brought a frivolous lawsuit or, in the alternative, had continued to litigate the lawsuit after its claim had become frivolous, unreasonable, or groundless. After the parties participated in an unsuccessful court-ordered mediation, the trial court set the matter for trial for October 27, 2014. After Olympic moved to continue that trial date, the trial court set the trial for February 3, 2015.

[9] On January 26, 2015, one week before trial, Alexin moved to voluntarily dismiss its complaint "without any explanation." *Id.* at 15. In addition, Alexin "reported to the Court that it had submitted payment to Olympic for the amount of Olympic's Invoice No. 004339 of $31,477.94 and prejudgment interest at 8%, for a total of $35,943.94." *Id.* The trial court granted Alexin's motion to dismiss its complaint, with prejudice, and the parties submitted briefs on Olympic's counterclaim for attorney's fees.

[10] Thereafter, the trial court entered judgment for Olympic on its counterclaim, finding and concluding in relevant part as follows:

FINDINGS OF FACT

* * *

4. On March 19, 2013, Alexin sent an email to its suppliers regarding its current aluminum scrap needs with real-time pricing, which included 2024 aluminum scrap along with various other types of scrap aluminum.

5.    Beside the list of various aluminum needs and the price per pound, the email provides that "All items must be clearly segregated by type" and "3 items per load."

* * *

14.    On April 25, 2013, Alexin issued a Receipt #RCT013504 to Olympic for Purchase Order No. 16208 for "2XXX AL SCRAP" showing Alexin received 40,643 pounds, of which 37,252 pounds comprised the weight Alexin was willing to pay after deducting the weight of the shipping pallets. The receipt also shows "Contaminate Deductions" of 3,448 pounds.

15.    The receipt further states "Note: This load was received per Alexin's Terms and Conditions and applicable receiving procedures."

16.    Alexin's employees took both the Series 2024 and Series 2090 aluminum Alexin received on April 25, 2013[,] to the same 2024 alloy bin: "The goods were received in Alexin's scrap yard via a fork lift, and taken to the 2024 alloy bin." (Plaintiff Alexin, LLC's Responses to Defendant's Interrogatories served March 20, 2014, Answer to Interrogatory No. 2).

* * *

34.    Olympic has incurred the following expenses and fees in defending against Alexin's complaint and in prosecuting its claim against Alexin:

a.    Attorney fees                                      $29,480.00

b.    The Mediation Group                          $1,386.26

c.    Filing fees . . . and mileage expenses        $581.29

d.    Other expenses for travel and lodging . . . .    $5,000.00

Total:                                    $36,447.55

CONCLUSIONS OF LAW

1.     Indiana Code [Section] 34-52-1-1 provides:

* * *

b.     In any civil action, the court may award attorney's fees as part of the costs to the prevailing party, if the court finds that either party:

1)     brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;

2)     continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or

3)     litigated the action in bad faith.

* * *

8.     Based upon the fact Olympic recovered of [sic] the entire amount requested in its Counterclaim 8 days prior to the scheduled jury trial, after all discovery had closed and consistent with other Indiana decisions, this Court determines that Olympic is a "prevailing party" for purposes of I.C. [§] 34-52-1-1.

9.     The next issue to resolve is whether Alexin litigated the action in bad faith or brought and/or continued to litigate an action that was frivolous, groundless, or unreasonable.

10.    Indiana law provides that a claim is "frivolous" (a) if it is taken primarily for the purpose of harassing or maliciously

injuring a person, or (b) if the lawyer is unable to make a good faith and rational argument on the merits of the action, or (c) if the lawyer is unable to support the action taken by a good faith and rational argument for an extension, modification, or reversal of existing law. A claim is "unreasonable" if, based on the totality of the circumstances, including the law and the facts known at the time of the filing, no reasonable attorney would consider that the claim was worthy of litigation or justified. *See Kahn v. Cundiff*, 533 N.E.2d 164 (Ind. Ct. App. 1989).

* * *

12. "The trial court is not required to find an improper motive to support an award of attorney's fees; rather, an award may be based solely on a lack of good faith and rational argument in support of the claim."

13. Here, the records exist that[,] while Alexin may have intended to purchase and receive 2024 aluminum scrap, it nonetheless ordered 2xxx aluminum scrap which can be both 2024 and 2090 aluminum. The shipment was segregated by type; 2024 sheets, 2090 sheets[,] and 2024 extruded aluminum. The attached paper to the bill of lading, which were marked "received" by Alexin's employee, clearly identifies the specific type of aluminum contained in the shipment. Finally, both the series 2024 aluminum and 2090 series aluminum were marked with the respective series number.

14. Alexin issued Receipt #RCT013504 to Olympic for Purchase Order No. 16208 for "2XXX AL SCRAP" showing Alexin received 40,643 pounds, of which 37,252 pounds comprised the weight Alexin was willing to pay after deducting the weight of the shipping pallets. The receipt also shows "Contaminate Deductions" of 3,448 pounds[, which is the weight of the shipping pallets]. Clearly, Alexin had the opportunity and did inspect the shipment in order to determine the actual amount of aluminum it had purchased. Alexin could

have deducted the 2090 series aluminum as a contaminate if [it] had [chosen] to.

15. Alexin's own terms and conditions in its "Purchased Scrap Specifications" provide that incoming material will be inspected in regard to material type and chemistry and rejected or downgraded. Alexin apparently failed to follow its own procedure.

16. Alexin's employees comingled the series 2024 and series 2090 aluminum once they received the shipment of aluminum.

17. Alexin argues that because it purchases 19 million pounds of aluminum scrap and aluminum each month, it must rely on its suppliers to strictly comply with its purchase orders. Further, they argue the volume of aluminum purchased prohibits inspection of each and every piece of aluminum scrap. Therefore, because of the sheer volume of purchasing and the consequences of receiving nonconforming material, it would be incumbent on Alexin to insure its purchase orders are clear and unambiguous. Apparently, in the industry, 2XXX can be interpreted as both 2024 Series and 2090 Series aluminum. In fact[,] when Alexin discovered the source of the problem with the product they were producing[,] . . . its CEO notified some employees, including Anita Eads[,] and its purchasing agent, Kevin Ferguson, that they should be very specific when purchasing 2024 aluminum in the future.

18. Clearly, based upon the email of CEO, Tom Horter, (prior to the litigation) Alexin realized they may have in fact received exactly what they ordered, despite what they intended.[4]

---

[4] This finding, based on Horter's statement in the email, that "Alexin realized they [sic] *may have* in fact received exactly what they ordered," is insignificant. (Emphasis added). When Horter sent his email, he was speculating and did not yet know that the Alexin purchase order specifically called for 2024 sheets and that

19. Despite knowing they may have ordered incorrect material, they not only initiated a lawsuit against Olympic, they discussed the incident with an industry trade magazine. While possible, the Court doubts very much that a reporter from the trade publisher, American Metal Market, just happened to be combing through filings of the Wells Circuit Court on the very day the lawsuit was initiated. Clearly, based upon the timing, Alexin notified American Metal Market sufficiently in advance of its lawsuit such that an article appeared on American Metal Market's website concurrently with the filing.

20. Clearly, the lawsuit and accompanying publicity were taken primarily for the purpose of harassing or maliciously injuring Olympic and, therefore, was done frivolously.

21. Furthermore, Alexin continued to litigate the matter once it became clearly frivolous. Extensive discovery was performed by the parties and the information provided to the Court, which it has relied upon for its decision, was available to Alexin at some point during the litigation. Alexin makes no claim that the information only became available 8 days prior to the trial.

22. The Court finds that Olympic incurred attorney fees in the sum of $29,480.00. The fees were incurred from the 147.40 hours of service its attorney performed and are reasonable.

23. The Court further finds that Olympic incurred expenses in the sum of $1,967.55 defending Alexin's complaint and preparing for the scheduled jury trial.

---

the shipment was nonconforming. Of course, neither did Horter know at the time that the shipment was segregated by type and that Alexin could have easily sorted the 2024 from the 2090 aluminum.

Appellant's App. at 12-18 (some citations omitted).  Alexin filed a motion to correct error, which the trial court denied.  This appeal ensued.

## Discussion and Decision

[11] Alexin contends that the trial court abused its discretion when it awarded attorney's fees to Olympic under Indiana Code Section 34-52-1-1(b).  We review a trial court's decision to award attorney's fees and any amount thereof for an abuse of discretion.  *Purcell v. Old Nat'l Bank*, 972 N.E.2d 835, 843 (Ind. 2012).  A trial court abuses its discretion if its decision clearly contravenes the logic and effect of the facts and circumstances or if the trial court has misinterpreted the law.  *Id.*  Further, we note that, because the trial court's factual findings were based on a paper record, we conduct a *de novo* review of the record.  *See Equicor Dev., Inc. v. Westfield-Washington Twp. Plan Comm'n*, 758 N.E.2d 34, 37 (Ind. 2001).  Thus, our review here is akin to review of a summary judgment order, where a trial court's findings are not binding on this court on appeal.  *See Nagel v. Northern Ind. Pub. Serv. Co.*, 26 N.E.3d 30, 42 (Ind. Ct. App. 2015), *trans. denied*.

[12] Indiana Code Section 34-52-1-1, the General Recovery Rule, provides in relevant part as follows:

> (a) In all civil actions, the party recovering judgment shall recover costs, except in those cases in which a different provision is made by law.

(b) In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:

(1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;

(2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or

(3) litigated the action in bad faith.

[13] Here, the trial court concluded that Alexin brought the action on a claim that was frivolous or, at the very least, continued to litigate the action after it became frivolous. A claim or defense is "frivolous" (a) if it is taken primarily for the purpose of harassing or maliciously injuring a person; (b) if the lawyer is unable to make a good faith and rational argument on the merits of the action; or (c) if the lawyer is unable to support the action taken by a good faith and rational argument for an extension, modification, or reversal of existing law. *Kahn v. Cundiff*, 533 N.E.2d 164, 170 (Ind. Ct. App.), *adopted*, 543 N.E.2d 627 (Ind. 1989).

[14] On appeal, Alexin contends that two of the trial court's findings[5] are not supported by the evidence. First, Alexin challenges the trial court's "Conclusion No. 13" that, "while Alexin may have intended to purchase and

---

[5] Both findings challenged by Alexin on appeal are listed as "Conclusions" in the trial court's order. For ease of discussion, we refer to them as "findings."

receive 2024 aluminum scrap, it nonetheless ordered 2[XXX] aluminum scrap[,] which can be both 2024 and 2090 aluminum." Appellant's App. at 17. While it is true that 2XXX aluminum scrap includes both 2024 and 2090 alloys, and while the purchase order states that Alexin is seeking 2XXX aluminum scrap, the purchase order also unambiguously states that Alexin purchased only "2024 sheets with thin paper in between." *Id.* at 292. Thus, we agree with Alexin that this finding is erroneous.

[15] Second, the trial court found as follows in "Conclusion No. 19": "Clearly, based upon the timing, Alexin notified American Metal Market sufficiently in advance of its lawsuit such that an article appeared on American Metal Market's website concurrently with the filing." *Id.* at 18. We agree with Alexin that there is no actual evidence or reasonable inference from the evidence to support that finding.[6] Regardless, given the remainder of the trial court's findings, which are supported by the evidence, and given our standard of review, we cannot say that these two erroneous findings require reversal.

[16] Alexin also contends that the trial court erroneously concluded that Alexin "lacked a legal basis for its claims" against Olympic. Appellant's Br. at 17. In

---

[6] The trial court was incredulous that a reporter "just happened to be combing through filings of the Wells Circuit Court on the very day the lawsuit was initiated." Appellant's App. at 18. But the story came out one day after the *federal* lawsuit was filed, not one day after suit was filed in state court. Given that there is no evidence that Alexin alerted AMM to the lawsuit, and given that the AMM reporter is just as likely to have learned of the federal lawsuit by other means, we cannot agree with the trial court that "clearly" Alexin had notified AMM about the lawsuit.

particular, Alexin maintains that, contrary to Olympic's contention that Alexin could not recover damages because Alexin had accepted the nonconforming 2090 sheets, its claims against Olympic "were well supported under the Uniform Commercial Code and the parties' agreement." *Id.* In support of that argument, Alexin maintains that

> [t]he Uniform Commercial Code ("UCC"), which governs the parties' agreement for the sale of goods, . . . "requires that the seller put and hold conforming goods at the buyer's disposition." Ind. Code § 26-1-2-503(1). The UCC gives buyers who, like Alexin, receive non-conforming goods, the authority to accept or to reject those goods. [Ind. Code] § 26-1-2-601. A buyer who accepts goods and notifies a seller that the goods do not conform to the parties' agreement "may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." [Ind. Code] § 26-1-2-714(1). A buyer may also seek to recover incidental and consequential damages. [Ind. Code] § 26-1-2-714(3). Consistent with the UCC, Alexin's Standard Terms and Conditions of Purchase also provide that "[f]ailure to inspect, accept, reject[,] or detect defects by inspection shall neither relieve [Olympic Metals] from its responsibilities for such materials as are not in accordance with the [Purchase] Order requirements nor impose liabilities on Alexin."

*Id.* at 17-18 (some citations omitted). Further, Alexin contends, in effect, that, because it did not discover the nonconforming aluminum until after it had comingled the 2024 and 2090 aluminum, Alexin's acceptance of the nonconforming aluminum was reasonably induced by the difficulty of discovery before the acceptance. In particular, Alexin states as follows:

The UCC and Alexin's Standard Terms and Conditions of Purchase reflect the business reality that manufacturers must rely upon their suppliers to provide conforming goods because it is impractical for a manufacturer to inspect every item it receives. Alexin buys nineteen million pounds of aluminum every month. Accordingly, Alexin must rely on rigid purchasing specifications and its suppliers' quality systems to ensure the aluminum received conforms to the applicable purchase order, and Alexin's Purchased Scrap Specification.

Appellant's Br. at 18. Alexin further contends that it rightfully relied on Olympic's assurances upon delivery, as indicated in the purchase order and bill of lading, both of which stated that only 2024 sheets were included in the delivery.[7]

[17] We agree with Alexin that the undisputed evidence shows that Olympic delivered 8,060 pounds of 2090 sheets in contravention of the purchase order. But that evidence does not end our inquiry as it does not resolve the issue of whether, on these facts, Alexin was entitled to revoke acceptance of the delivery. Indiana Code Section 26-1-2-608 provides in relevant part as follows:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him *if he has accepted it*
>
> * * *

---

[7] Comment 3 to Indiana Code Section 26-1-2-608 states in relevant part that assurances by the seller "can rest as well in the circumstances or in the contract as in explicit language used at the time of delivery."

> (b) *without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances*.

(Emphasis added).

[18]     In *Trisler v. Carter*, 996 N.E.2d 354 (Ind. Ct. App. 2013), Carter bought a chest of drawers for his sister-in-law. After he got home and cleaned out the drawers, Carter noticed that nails were sticking out through the backs of the drawers. Carter then tried to return the chest of drawers to Trisler, but Trisler refused to issue a refund. Carter sued, and the trial court entered judgment in favor of Carter. On appeal, we held that, even though the chest of drawers was nonconforming to Carter's needs, Carter was not entitled to revoke his acceptance under Indiana Code Section 26-1-2-608(1)(b). Specifically, we stated as follows:

> The fact that Carter was able to discover the defect upon opening the drawers of the chest while cleaning it *belies the difficulty of discovering the non-conformity*, and there is no allegation that Trisler in any way kept Carter from inspecting the chest of drawers prior to his purchase of it. Therefore, I.C. § 26–1–2–608(1)(b) . . . does not apply to allow Carter to revoke his acceptance of the chest of drawers. . . . Therefore, we conclude that the trial court erred in entering judgment for Trisler and we reverse its decision.

*Id.* at 358 (emphasis added).

[19]     Here, again, the undisputed evidence shows that there were three types of aluminum scrap included in the April 25 shipment: 2024 aluminum sheets;

2024 extruded aluminum; and 2090 aluminum sheets. All three were clearly stamped as 2024 or 2090 alloys,[8] and all three were segregated on separate pallets. While the bill of lading and purchase order stated that only 2024 sheets had been delivered, a handwritten note accompanying those documents upon delivery clearly indicated that 8,060 pounds of 2090 aluminum was included in the delivery,[9] and Steele, an Alexin employee, stamped all three documents "Received" and signed his name to them. As the trial court concluded, Alexin "had the opportunity and did inspect the shipment in order to determine the actual amount of aluminum it had purchased." Appellant's App. at 17. It follows then, that Alexin also had the opportunity to identify the alloys included in the delivery. A reasonable inspection would have alerted Alexin to the nonconforming 2090 sheets immediately upon delivery. Alexin does not allege any latent defects in the aluminum shipment.

[20] The trial court further concluded that "Alexin's own terms and conditions in its 'Purchased Scrap Specifications' provide that incoming material will be inspected in regard to material type and chemistry and rejected or downgraded. Alexin apparently failed to follow its own procedure." *Id.* at 18. Alexin does

---

[8] We note that Eads took photographs of the stamps on the sheets and attached those photos to her June 4 email to Shiver. We also note that, after the batch of ingots had to be scrapped, Alexin was able to identify the 2090 sheets remaining in the 2024 bin and remove the 2090 sheets. At no time has Alexin alleged that it had difficulty differentiating between the 2024 and 2090 sheets.

[9] The handwritten note indicates that the order originated with a company called "BSCM, Inc." Appellant's App. at 231. As Alexin points out in its brief on appeal, Olympic is a broker and, therefore, it "does not take possession of, sort, load, or ship scrap metals to its customers but, instead, relies on other sellers of aluminum and transportation companies to fill the orders it accepts." Appellant's Br. at 7. Thus, that Olympic contracted with a third party to fill the purchase order was consistent with its business model, which was known to Alexin at the time of delivery.

not dispute that fact on appeal. Accordingly, the evidence shows that Alexin's acceptance of the nonconforming goods was not reasonably induced either by the difficulty of discovering the nonconformity or by any assurances from Olympic, and Alexin did not rightfully revoke its acceptance of the 2090 sheets under Indiana Code Section 26-1-2-608. *See Trisler*, 996 N.E.2d at 358; *see also Scotco Inc. v. Dormeyer Indus.*, 402 F.2d 336, 338 (7th Cir. 1968) (interpreting similar prior statute under Uniform Sales Act to prohibit revocation of acceptance where buyer did not allege latent defects in product accepted).

Further, it is well settled that the UCC limits a nonbreaching party's damages to those that are proximately caused by the breach, and,

> [w]here the injury involved follows the use of goods *without discovery of the defect causing the damage*, the question of "proximate" cause turns on whether it was *reasonable for the buyer to use the goods without such inspection as would have revealed the defects*. If it was not reasonable for him to do so, *or if he did in fact discover the defect prior to his use*, the injury would not proximately result from the breach of warranty.

I.C. § 26-1-2-715 cmt. 5 (emphases added).[10]

Here, again, the evidence supports the conclusion that Alexin's failure to identify the 2090 sheets prior to using them was not reasonable, and, therefore,

---

[10] Alexin cites to Indiana Code Section 26-1-2-714 in support of its contention that it is entitled to damages for Olympic's breach despite Alexin's acceptance of the goods. Comment 4 of that statute states that incidental and consequential damages in that circumstance are explained in the comment to Section 26-1-2-715.

that Olympic's breach did not proximately cause Alexin's claimed damages. In particular, Alexin accepted the shipment containing both 2024 and 2090 sheets; each type of aluminum was clearly stamped as 2024 or 2090; each type was segregated from the other on separate pallets; and Steele, on Alexin's behalf, signed his name to the handwritten note, which clearly stated that the shipment contained both 2024 and 2090 sheets. The evidence supports the trial court's finding that, prior to notifying Olympic that part of the shipment was nonconforming, Alexin comingled the 2024 and 2090 sheets. And Alexin used the comingled aluminum scrap to produce a batch of ingots.[11]

[23] In sum, we review the trial court's attorney's fee award for an abuse of discretion. The evidence shows that Alexin's acceptance of the 2090 sheets was not reasonably induced either by the difficulty of discovery before acceptance or by Olympic's assurances. The evidence also shows that, had Alexin not accepted the nonconforming aluminum or had not comingled the 2090 sheets with the 2024 sheets, Alexin would not have sustained the damages alleged in its complaint. Olympic erred in delivering the 2090 sheets along with the 2024 sheets, but that created only a storage problem for Alexin until Olympic could retrieve the nonconforming goods.[12] Alexin would not have suffered any

---

[11] After Alexin discovered the problem with the high lithium, it was able to "sort[] out" the 2090 sheets from the 2024 sheets, and it placed the remaining 2090 sheets on a pallet for Olympic to retrieve. Appellant's App. at 236. Then, despite Olympic's offer to pick up the remaining 2090 sheets and accept payment only for the 2024 sheets under the purchase order, Alexin filed this lawsuit.

[12] Of course, Steele could have rejected the 2090 portion of the shipment as nonconforming upon delivery.

damages beyond that inconvenience but for Alexin's own conduct in comingling the two alloys.

[24] Alexin knew, or reasonably should have known, that its damages were self-inflicted when it filed its complaint against Olympic. Notwithstanding Olympic's breach of warranty, the evidence supports the conclusion that, for lack of proximate cause, Alexin did not have a good faith or rational argument to support its claim for damages under the UCC. Given our standard of review, we cannot say that the trial court's judgment is clearly against the logic and effect of the facts and circumstances or that the court misinterpreted the law. Thus, we hold that the trial court did not abuse its discretion when it awarded Olympic attorney's fees under Indiana Code Section 34-52-1-1(b).

## Cross-Appeal

[25] Olympic cross-appeals and requests appellate attorney's fees under Indiana Appellate Rule 66(E), which provides: "The Court may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorney's fees." Our discretion to award attorney's fees under Appellate Rule 66(E) is limited, however, to instances when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay. *Helmuth v. Distance Learning Systems Ind., Inc.*, 837 N.E.2d 1085, 1094 (Ind. Ct. App. 2005). Additionally, while Appellate Rule 66(E) provides this court with discretionary authority to award damages on appeal, we must use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of

the right to appeal. *Id.* A strong showing is required to justify an award of appellate damages, and the sanction is not imposed to punish mere lack of merit, but something more egregious. *Id.*

[26] Olympic contends that, on appeal, "Alexin has omitted or misstated many of the facts in the record and should be required to pay Olympic Metals' appellate attorney fees." Appellee's Br. at 46. Olympic then lists seven examples of alleged omissions and misstatements by Alexin in its brief. But four of the alleged misstatements are *not* misstatements at all, and the others are not gross misstatements of the facts. We cannot say that Alexin's brief on appeal is "permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay." *See Helmuth*, 837 N.E.2d at 1094. Rather, Alexin makes cogent argument based on relevant case law and citations to the record. Indeed, we agree with Alexin that two of the trial court's findings are not supported by the evidence. We deny Olympic's request for appellate attorney's fees.

[27] Affirmed.

Riley, J., and May, J., concur.