

FILED

May 29 2019, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

William E. Emerick
Tyler L. Jones
Stuart & Branigin LLP
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Andrea E. Rahman
Patricia C. McMath
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Milan Jurich, Personal
Representative of the Estate of
Rade Jurich, and Rajna Jurich,

*Appellants-Plaintiffs,*

v.

Indiana Department of
Transportation,

*Appellee-Defendant.*

May 29, 2019

Court of Appeals Case No.
18A-CT-1417

Appeal from the
Tippecanoe Superior Court

The Honorable
Steven P. Meyer, Judge

Trial Court Cause No.
79D02-1601-CT-10

**Kirsch, Judge.**

[1] Rajna Jurich ("Rajna"), individually, and Milan Jurich, as personal

representative of the estate of Rade Jurich (together, "the Jurichs"), appeal the

trial court's grant of summary judgment in favor of the Indiana Department of

Transportation ("INDOT") in the Jurichs' suit alleging negligence, wrongful death, and negligent infliction of emotional distress. On appeal, the Jurichs raise the following restated issues:

I. Whether the trial court erred by granting summary judgment in favor of INDOT, finding that INDOT had discretionary function immunity because it engaged in a policy-based planning decision to not install a temporary traffic signal at the newly constructed intersection where the Jurichs' accident occurred;

II. Whether the trial court abused its discretion by denying the Jurichs' motion to correct error based on their claim of the newly discovered evidence of a 2011 traffic study and related emails; and

III. Whether the trial court abused its discretion by rescinding its previously ordered discovery sanctions against INDOT.

We affirm.

## Facts and Procedural History

The motor vehicle collision that gave rise to the instant action occurred at the intersection ("the Intersection") of U.S. Highway 231 ("US 231") and Cumberland Avenue, West Lafayette, Indiana. The Intersection was created as part of a $45,600,000 construction project ("the US 231 Project") to relocate and reconstruct US 231 as a bypass around the City of West Lafayette, in Tippecanoe County. *Appellants' App. Vol. 2* at 55. The US 231 Project was part of a "Major Moves" project. *Id.* A traffic study for the US 231 Project began around 2008 but was not completed until 2010. *Tr. Vol. 2* at 68. The actual

construction of the US 231 Project began in 2011 and was completed in 2013. *Appellants' App. Vol. 2* at 55.

[4] Around that same time, a "local highway safety improvement project for Cumberland Avenue" was also underway ("the Cumberland Project"). *Id.* at 49. The Cumberland Project, which was "a federally funded Local Partnership agreement with [Tippecanoe] County" and distinct from the US 231 Project, extended Cumberland Avenue, thereby also impacting the Intersection. *Id.* INDOT provided no state money for the Cumberland Project and had minimal involvement in that project; instead, INDOT "served as a pass-through entity for federal funds to the County." *Appellants' App. Vol. 3* at 122. In April 2014, "West Lafayette and Tippecanoe County highway officials lobbied INDOT heavily—but unsuccessfully—for the erection of [a temporary traffic control] signal" at the Intersection as part of the Cumberland Project. *Appellants' App. Vol. 2* at 56.

[5] By statute, INDOT must follow the Indiana Manual on Uniform Traffic Control Devices ("the Manual") when determining whether to install a traffic signal at a specific intersection. *See* Ind. Code § 9-21-4-1. Pursuant to the Manual, "[a]n engineering study of traffic conditions, pedestrian characteristics, and physical characteristics of the location shall be performed to determine whether installation of a traffic control signal is justified at a particular location." *Appellants' App. Vol. 2* at 99. The Manual contains a list of nine factors ("warrants") that INDOT must consider in making its decision whether to install a traffic signal at an intersection. *Id.* The Manual states that a "traffic

control signal should *not* be installed unless one or more of the [warrants] . . . are met." *Id*. (emphasis added).

[6] The US 231 Project created eight new intersections. In 2010, George Kopcha ("Kopcha"), INDOT's Crawfordsville District Traffic Planning Engineer, conducted a "Signal Warrant Analysis" of those "Proposed New Intersections" ("2010 Study"). *Appellants' App. Vol. 2* at 182-89; *Appellee's App. Vol. 2* at 5-12. Looking only at Warrant 1 (Eight-Hour Vehicular Volume), INDOT determined that: (1) five of the eight intersections met the Manual's ADT volume requirement to justify installation of a temporary traffic signal; (2) one intersection needed to be closer to completion to make a determination; and (3) two intersections did not meet the Manual's requirements to justify a temporary traffic signal. *Appellants' App. Vol. 2* at 182-89; *Appellee's App. Vol. 2* at 5-12. The Intersection was one of the two intersections that did not meet the ADT volume requirements to justify the installation of a temporary traffic signal. *Appellants' App. Vol. 2* at 185-86; *Appellee's App. Vol. 2* at 8-9. INDOT planned to do a second study after the intersection opened to traffic in April 2014, and in the meantime, INDOT decided to install stop signs for vehicles travelling eastbound and westbound on Cumberland Avenue. *Appellants' App. Vol. 2* at 28, 39. Vehicles traveling northbound and southbound on US 231 were not required to stop. *Id*. at 172.

[7] On July 15, 2014, about three months after the opening of the Intersection and twelve days before Rade and Rajna's accident, Kopcha performed INDOT's second traffic study. The analysis of the July 2014 traffic study, which was

completed on August 14, 2014, showed that traffic still did not meet the Manual's required minimum ADT volume to justify a temporary traffic signal. *Id*. at 29. Because INDOT anticipated an increase in traffic at the Intersection once Purdue University was back in session, INDOT planned to perform a third study in the fall of 2014. *Id*. at 103-04. In October 2014, INDOT conducted a third traffic study,[1] which showed that increased traffic now met the criteria for installation of a traffic signal.[2] A traffic signal was placed at the Intersection. *Id*. at 29.

[8] On July 27, 2014, before the results of the July 2014 traffic study had been released, Rade was driving his Honda Accord eastbound on Cumberland Avenue toward its intersection with US 231, with Rajna as his passenger. He approached US 231 driving in the left through-lane of Cumberland Avenue and came to a complete stop at the Intersection's stop sign. Rade proceeded part way across the Intersection, when his car was struck by a Lexus operated by Saeyeov Kim ("Kim").[3] In an affidavit, accident-reconstruction expert Jay Nogan, stated Kim was traveling 72 miles-per-hour, a speed well over US 231's posted speed limit of 55 miles-per-hour. *Id*. at 154. The force of the collision

---

[1] It is not clear whether this study was completed in September or October of 2014. *Appellants' App. Vol. 3* at 5, 14. For ease of reference, and because the exact date does not change our analysis, we will assume this traffic study was completed in October 2014.

[2] The same four INDOT employees participated in the 2010, July 2014, and October 2014 traffic studies. They were Alan Plunkett, Crawfordsville District Deputy Commissioner; George Kopcha, Crawfordsville District Traffic Planning Engineer; William R. Smith, Crawfordsville District Traffic Engineer; and Joe Lewein, Crawfordsville District Technical Services Director. *Appellants' App. Vol. 2* at 101-04.

[3] The record contains two spellings: Sae Y. Kim and Saeyeov Kim. *Appellants' App. Vol. 2* at 54, 63.

propelled Rade's vehicle across the Intersection, "where it careened off the roadway" and then veered back onto Cumberland Avenue, where it came to a rest. *Id*. Rade and Rajna suffered serious injuries, including fractured ribs, cracked teeth, severe bruising, internal bleeding, and the destruction of a cochlear implant; Rade ultimately died from his injuries. *Id*. at 155. Kim's insurer, GEICO, agreed to tender the single person bodily injury limit of $100,000 to settle the Estate's claim and $100,000 to settle Rajna's claim. *Appellants' App. Vol. 2* at 55.

[9] In January 2016, the Jurichs filed their complaint against INDOT, alleging that INDOT was negligent.[4] Specifically, the Jurichs argued that INDOT breached its "duty to exercise reasonable care in the design and maintenance of its highways for the safety of public users" by "failing to properly conduct a traffic study" and "failing to erect a [temporary] traffic control signal at the [I]ntersection." *Id.* at 57. The Jurichs claimed that INDOT's alleged negligence resulted in injuries to Rajna, the wrongful death of Rade, and negligent infliction of emotional distress to Rajna. *Id*. at 57-59. In February 2016, INDOT filed its answer and affirmative defenses.[5] *Id*. at 8, 66-75.

---

[4] On the date of the accident, the Jurichs were insured by Hanover Insurance Group LLC, which provided bodily injury coverage of $250,000 per person and $500,000 per occurrence. *Appellants' App. Vol. 2* at 54-55. The Jurichs' policy also contained medical payments coverage of $10,000 per person and Uninsured Underinsured Motorist coverage of $250,000 per person and $500,000 per accident. *Id*. at 55. The Jurichs also named Hanover as a defendant. In October 2016, the trial court granted the Jurichs' and Hanover's Joint Stipulation for Dismissal. *Id.* at 11.

[5] INDOT set forth affirmative defenses, including: (1) the Jurichs were careless and negligent with regard to their own safety and wellbeing, which proximately caused or contributed to the injuries and damages alleged;

[10] On August 7, 2017, INDOT filed its motion for summary judgment and attached thereto its designated evidence. *Appellants' App. Vol. 2* at 14, 76-89. Summarized, INDOT argued that the Jurichs could not recover damages because: (1) Rade was contributorily negligent; (2) INDOT's decision to not install a temporary traffic signal was entitled to discretionary function immunity pursuant to Indiana Code section 34-13-3-3(7) of the Indiana Tort Claims Act ("the ITCA"); and (3) the undisputed material evidence negated at least one element of the Jurichs' negligence claim. *Id*. at 81-88. In September 2017, the Jurichs filed their response in opposition to summary judgment and designated their supporting evidence. That same day, the Jurichs also filed their motion to strike INDOT's designated evidence. INDOT filed a reply to the Jurichs' response in opposition to summary judgment and a response to the Jurichs' motion to strike designated evidence. The Jurichs, in turn, filed a motion to substitute their previously designated Exhibit 4. *Appellee's App. Vol. 2* at 2-12. On October 18, 2017, the trial court held a hearing on the outstanding motions, including the motion for summary judgment. The trial court granted the Jurichs' motion to strike INDOT's Exhibit A (the crash report) and took all other matters under advisement.

---

(2) the Jurichs' alleged injuries were the proximate result of the their having voluntarily assumed risk; (3) INDOT is immune from liability because their act was a discretionary function under the Indiana Tort Claims Act; (4) the Jurichs have been fully or partially compensated for their injury and are not entitled to recover from INDOT and or INDOT is entitled to a full or partial set-off; (5) the Jurichs did not mitigate damages; (6) the Jurichs failed to state a cause of action upon which relief may be granted; (7) INDOT was not the proximate cause of the injuries; and (8) INDOT did not have actual or constructive notice of a dangerous situation. *Appellants' App. Vol. 2* at 73-74.

[11] Meanwhile, the parties were engaging in discovery. The Jurichs had served interrogatories and a request for production on INDOT. Specifically, the Jurichs asked INDOT "to provide information regarding the facts and studies [that] INDOT used to determine whether or not to install a [temporary] traffic signal at the [Intersection]." *Appellants' App. Vol. 3* at 2. In its response, INDOT provided the Jurichs with the following documents: (1) the 2010 Study; (2) the July 2014 traffic study; and (3) the October 2014 traffic study. *Id.* at 3-4. INDOT did not produce a later-discovered 2011 study of the Intersection ("Structurepoint Study"), which American Structurepoint had completed for Tippecanoe County. *Id.* at 86. The Jurichs also asked INDOT to "[i]dentify all communication, contact, and correspondence INDOT received from officials and representatives from West Lafayette, Indiana, Tippecanoe County, Indiana and any other government entity regarding the intersection at US Highway 231 and Cumberland Avenue." *Appellants' App. Vol. 2* at 101. Around February 2017, INDOT responded, "None in INDOT's possession as of today's date." *Id.*

[12] In October 2017, after the hearing on summary judgment, the Jurichs' counsel obtained—from Opal Kuhl, a retired engineer who had worked for Tippecanoe County—various documents, including a copy of the Structurepoint Study and related 2011 emails. The Structurepoint Study agreed with INDOT's 2010 Study's determination that the Intersection's average daily traffic ("ADT") volume for Warrant 1 was not met; however, the Structurepoint Study found that the requirements for Warrant 3 (Peak Hour) had been met. *Id.* at 86.

Based on the discovery of these documents, the Jurichs concluded that INDOT had withheld important information, arguing that Warrant 3 justified the installation of a temporary traffic signal.

[13] The Jurichs filed a motion for sanctions, alleging that INDOT had intentionally kept those documents from them. *Id*. at 2-10. INDOT responded, refuting as baseless the Jurichs' contention that INDOT intentionally concealed the Structurepoint Study and associated 2011 emails. *Appellants' App. Vol. 3* at 40. INDOT cited to the deposition of William R. Smith ("Smith"), who was at that time INDOT's Crawfordsville District Traffic Engineer, who said that he and other employees had searched for the emails; however, INDOT's policy regarding purging old emails resulted in no emails prior to 2014 being in the system. *Id*. Furthermore, Smith said he had no record of ever receiving the Structurepoint Study, but even if he had, it would have been of no use to INDOT because INDOT could not have used this analysis to determine a temporary traffic signal was warranted at the Intersection "as Warrant 3—Peak Volume—cannot be used for *future* intersections according to the [Manual]." *Id*. at 41, 56. The Jurichs filed a reply.

[14] On January 23, 2018, the trial court issued two separate orders. In its order pertaining to INDOT's motion for summary judgment and the Jurichs' motions to strike designated evidence and to substitute Exhibit 4, the trial court determined that the designated evidence was as follows: INDOT's Exhibits B, C, D, E, and F and the Jurichs' Exhibit 1, Substituted Exhibit 2 (striking

paragraph 11), Exhibit 3, and substituted Exhibit 4.[6] The trial court denied INDOT's motion for summary judgment on the claim that Rade had been contributorily negligent, finding that there was a genuine issue of material fact regarding "(a) whether Kim's vehicle 'constituted an immediate hazard' to trigger the Rade's duty to yield and (b) whether Rade had a genuine belief Kim was sufficiently far enough away to justify crossing the [I]ntersection." *Appellants' App. Vol. 2* at 37. However, the trial court granted summary judgment in favor of INDOT, finding that INDOT qualified for discretionary function immunity under the ITCA. *See* Ind. Code § 34-13-3-3(7). Specifically, the trial court found that INDOT officials had "engaged in the required decision-making in considering the very improvement (traffic signal at US 231 and Cumberland) alleged in [the] Jurichs' complaint." *Appellants' App. Vol. 2* at 40.

[15] That same day, and in a separate order, the trial court granted the Jurichs' motion for sanctions, citing INDOT's "failure to disclose communications it had with Tippecanoe County officials regarding a temporary traffic signal at US 231 and Cumberland." *Id.* at 45. The trial court imposed sanctions and

---

[6] INDOT's designated exhibits consisted of: (1) Exhibit B, one page of the 2010 "Signal Warrant Analysis, Proposed US 231"; (2) Exhibit C, one page of the July 15, 2014 Signal Warrant Analysis of the Intersection; (3) Exhibit D, pages from the Manual; (4) Exhibit E, INDOT engineer Bill Smith's responses to the Jurichs' interrogatories; (5) Exhibit F, the entire report of "Signal Warrant Analysis, Proposed US 231." *Appellants' App. Vol. 2* at 77, 95-108, 182-89. The Jurichs designated exhibits consisted of: (1) Exhibit 1, the Complaint; (2) Substituted Exhibit 2, Affidavit of Fred Hanscom, professional engineer, containing the corrected ADT volume of 1,400; (3) Exhibit 3, Affidavit of Jay Nogan, an accident reconstruction expert; and (4) Substituted Exhibit 4, the entire report of "Signal Warrant Analysis, Proposed US 231." *Id.* at 144-52, 153-59; *Appellee's App. Vol. 2* at 2-12, 16-20.

ordered INDOT to pay the reasonable costs and attorney fees the Jurichs had incurred in its discovery of the Structurepoint Study and 2011 emails. *Id*.

[16] The Jurichs filed a motion to correct error on February 20, 2018, arguing that summary judgment should be overturned because the Structurepoint Study and related emails, which had come to the Jurichs' attention only after the summary judgment hearing, created a genuine issue of material fact by contradicting INDOT's claims that there was no justification for a temporary traffic signal at the Intersection. *Appellants' App. Vol. 3* at 74-80. Two days later, INDOT filed a motion for reconsideration of the sanctions, arguing that the Structurepoint Study and 2011 emails were not in INDOT's possession after 2014, were irrelevant to INDOT's claim of immunity, and were not discoverable under 23 United States Code sections 409 and 148(h)(4). *Id*. at 112-19. On May 7, 2018, the trial court denied the Jurichs' motion to correct error because the newly-discovered evidence was not material to the trial court's decision and granted INDOT's motion to reconsider sanctions because the evidence was not material and not discoverable. *Appellants' App. Vol. 2* at 47-51. The Jurichs now appeal.

# Discussion and Decision

## I. Summary Judgment

### A. Immunity

[17] The Jurichs appeal the trial court's grant of summary judgment in favor of INDOT, contending that the trial court erred in finding that the ITCA conferred discretionary function immunity on INDOT's decision to not install a

temporary traffic signal at the Intersection. *Appellants' Br*. at 16. On appeal of the grant or denial of a motion for summary judgment, we apply the same standard applicable to the trial court. *F.D. v. Ind. Dep't of Child Servs.*, 1 N.E.3d 131, 135 (Ind. 2013). "The moving party 'bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.'" *Id*. (quoting *Gill v. Evansville Sheet Metal Works, Inc.,* 970 N.E.2d 633, 637 (Ind. 2012)). If the moving party meets this burden, then the non-moving party must designate evidence demonstrating a genuine issue of material fact. *Id.*

[18]     "Review is limited to those facts designated to the trial court, Ind. Trial Rule 56(H), and summary judgment is appropriate where the designated evidence 'shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id*. (citing T.R. 56(C)). "In applying the facts to the law, '[a]ll facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party.'" *Id*. (quoting *Mangold ex rel. Mangold v. Ind. Dep't of Nat. Res.,* 756 N.E.2d 970, 973 (Ind. 2001)). "We must carefully review a decision on a summary judgment motion to ensure that a party was not improperly denied its day in court." *Id.*

[19]     "A trial court's findings and conclusions offer insight into the rationale for the court's judgment and facilitate appellate review but are not binding on this court." *Denson v. Estate of Dillard*, 116 N.E.3d 535, 539 (Ind. Ct. App. 2018). Moreover, "we are not constrained to the claims and arguments presented to the trial court, and we may affirm a summary judgment ruling on any theory

supported by the designated evidence." *Id.* The party that lost in the trial court has the burden of persuading us that the trial court erred. *Id.*

[20] Immunity, whether under Indiana common law or the ITCA, assumes negligence, but denies liability. *Putnam Cty. Sheriff v. Price*, 954 N.E.2d 451, 453 (Ind. 2011); *Bules v. Marshall Cty.*, 920 N.E.2d 247, 251 (Ind. 2010) ("Immunity presumes duty and breach—without duty and breach, there is no need for immunity."). "A traditional formulation of tort liability requires the plaintiff to establish a duty, breach of that duty, proximate cause, and damages." *Jones v. Hancock Cty. Bd. of Comm'rs*, 55 N.E.3d 311, 316 (Ind. Ct. App. 2016). "'In general, it is only after a determination is made that a governmental defendant is not immune under the ITCA that a court undertakes the analysis of whether a common law duty exists under the circumstances.'" *Id.* (quoting *Price*, 954 N.E.2d at 453). "This is in recognition of 'the principle that it is the legislature, and not the courts, that is in the best position to determine the nature and extent to which governmental units in Indiana should be insulated from tort liability.'" *Veolia Water Indianapolis, LLC v. Nat'l Trust Ins. Co.*, 3 N.E.3d 1, 5 (2014), *summarily aff'd on reh'g*, 12 N.E.3d 240 (Ind. 2014)).

[21] "'Pursuant to the ITCA, governmental entities can be subject to liability for tortious conduct unless the conduct is within an immunity granted by Section 3 of [the] ITCA.'" *City of Beech Grove v. Beloat*, 50 N.E.3d 135, 138 (Ind. 2016) (quoting *Veolia Water*, 3 N.E.3d at 5). Among other exempt acts, subsection (7) of Section 3 provides, "A governmental entity . . . is not liable if a loss results from . . . (7) [t]he performance of a discretionary function . . . ." Ind. Code §

34-13-3-3(7). "This type of immunity shields certain policy decisions which cannot be assessed by tort standards." *Lee by & through Estes v. Bartholomew Consol. Sch. Corp.*, 75 N.E.3d 518, 526 (Ind. Ct. App. 2017) (internal quotation marks omitted). In determining what acts qualify for discretionary function immunity under the ITCA, our Supreme Court has adopted the planning-operational test. *Peavler v. Bd. of Comm'rs of Monroe Cty.*, 528 N.E.2d 40, 42 (Ind. 1988).

[22] "We have held that planning functions are discretionary and thus shielded by immunity, whereas operational functions are not." *Lee,* 75 N.E.3d at 526.

> This assessment requires close consideration of the nature of the governmental actions and the decision-making process that was involved. . . . Planning activities include acts or omissions in the exercise of a legislative, judicial, or executive or planning function which involves formulation of basic policy decisions characterized by official judgment or discretion in weighing alternatives and choosing public policy. . . . The ultimate consideration is whether the action is one that was intended to be immune, and the court should look to the purposes of immunity to determine whether those purposes would be furthered by extending immunity to the act in question.

*Beloat*, 50 N.E.3d at 138 (internal citations and quotation marks omitted).

[23] The central issue in this case is whether INDOT performed a discretionary function under Indiana Code section 34-13-3-3(7). The discretionary nature of a decision to place a temporary traffic signal must be determined case by case. *Peavler*, 528 N.E.2d at 47. The starting point in our analysis is a review of the

process used by INDOT to make that decision. The Indiana General Assembly enacted legislation pertaining to "Traffic Control Devices" in Indiana Code chapter 9-21-4. Specifically, the legislature made the policy determination that "[a] governmental agency in Indiana that is responsible for the signing, marking, and erection of traffic control devices on streets and highways within Indiana *shall* follow the Indiana Manual on Uniform Traffic Control Devices for Streets and Highways." Ind. Code § 9-21-4-1 (emphasis added).

[24] Pursuant to the Manual, "[a]n engineering study of traffic conditions, pedestrian characteristics, and physical characteristics of the location shall be performed to determine whether installation of a traffic control signal is justified at a particular location." *Appellants' App. Vol. 2* at 99. Regarding installation of a temporary traffic signal at a *new* intersection, the Manual states:

> *Temporary traffic signals* may be installed at *new* intersections on *predicted* average daily traffic volumes, providing the predicted volumes meet prescribed minimum levels as noted in Condition A1 or Condition B1 of TABLE 4C-2. The temporary traffic signals may be placed in signal operation until proper traffic data and experience can be obtained. No downward adjustments are to be made to the [average daily traffic] required volumes.

*Appellants' App. Vol. 3* at 133 (emphasis added). Conditions A1 and B1 of Table 4C-2 are found only under a Warrant 1 analysis. *Appellants' App. Vol. 3* at 134. Conditions A1 and B1 reflect "Minimum Vehicular Volume" and "Interruption of Continuous Traffic," respectively. *Id.* The Warrant 1 Conditions consider each street's number of approach lanes and establish the required minimum

ADT volume of an intersection's major and minor streets *below which INDOT cannot consider the installation* of a temporary traffic signal.  *Id*.

[25]     At the Intersection, US 231 was the major street and Cumberland Avenue was the minor street and, at the time of the accident, both streets had two or more approach lanes.  *Id*. at 97.  When both streets have two or more lanes, the minimum ADT volume required to "justify consideration of signalization" (1) under Condition A1 is 10,000 for the major street and 6,000 for the minor street and (2) under Condition B1 is 15,000 for the major street and 3,100 for the minor street.  *Id*. at 182-83.

[26]     The 2010 Study revealed that, of the eight new intersections that were created by the US 231 Project, the Intersection was one of only two intersections with a predicted ADT volume that did not meet the Manual's standards to justify the installation of a temporary traffic signal under Warrant 1.  *Appellee's App. Vol. 2* at 8, 9.  At the time of the 2010 Study, the Intersection's *predicted* ADT volume for US 231, as the major street, was 12,250 cars for the northbound and southbound approach lanes and 3,200 cars for westbound Cumberland Avenue. *Id*. at 185, 189.  The diagram from the 2010 Study showed that, at that time, there was no eastbound traffic on Cumberland Avenue.  *Id*. at 189.  By the time the July 2014 Study was completed, however, INDOT estimated that the potential ADT volume for the eastbound lane of Cumberland would be 1,400 cars, for a total projected ADT volume of 4,600 cars on Cumberland. *Appellants' App. Vol. 2* at 33.  Since the ADT volume did not satisfy the Manual's Condition A1 or Condition B1 in either 2010 or July 2014, INDOT

had no discretion to install a traffic signal at the Intersection. *Appellants' App. Vol. 2* at 102.

[27] As our Supreme Court has cautioned, the ITCA is in derogation of the common law, and we construe it narrowly against the grant of immunity. *Murray v. Indianapolis Pub. Sch.*, 116 N.E.3d 525, 532 (Ind. Ct. App. 2018) . The party seeking immunity has the burden of establishing that its conduct comes within the provisions of the ITCA. *Id.* "Whether a particular governmental act is immune is a question of law for the court to decide, although the question may require extensive factual development." *Barnes v. Antich*, 700 N.E.2d 262, 265 (Ind. Ct. App. 1998), *trans. denied*. A "governmental entity must demonstrate that 'conscious balancing' took place, which can be shown by evidence that 'the governmental entity considered improvements of the general type alleged in [the plaintiff's] complaint.'" *Beloat*, 50 N.E.3d at 142.

[28] The Jurichs contend that INDOT was not performing a discretionary function when it completed the 2010 Study but was merely implementing a pre-determined policy.[7] *Appellants' Br.* at 20. The implementation of pre-determined policy cannot constitute the basis for this immunity. *See, e.g., Chandradat v. State of Ind., Ind. Dep't of Transp.*, 830 N.E.2d 904, 911 (Ind. Ct.

---

[7] During the hearing on the motion for summary judgment, the Jurichs argued that INDOT was not engaged in planning because "[t]here has to be evidence that involves more than just a look at the numbers. . . . And if you just look at the numbers, that doesn't take any planning at all. So, the State didn't do any planning. There, there was no systematic approach. No systematic program . . . of looking at whether or not traffic signals should be installed." *Tr. Vol. 2* at 34.

App. 2005) (holding that placement of signs was not part of planning stages of construction where INDOT-supervised contractors worked "pursuant to the plans, specifications, and direction of INDOT" and where the INDOT project-engineer did not determine where to put the signs "but instead implements the plan"), *trans. denied*.

[29] Under the facts of this case, INDOT's decision to not install a temporary traffic signal at a new intersection falls very close to the line between planning and operational activity. On the operational side, the parties do not dispute that US 231's predicted ADT volume was 12,250 and Cumberland's was 4,600.[8] Pursuant to Indiana Code section 9-21-4-1, INDOT was required to follow the Manual and, since the predicted ADT volume fell below the required minimum under Conditions A1 and B1 of Warrant 1, INDOT had no discretion to install a temporary traffic signal. Based on the Manual, INDOT could do nothing other than reject the proposal for the installation of a temporary traffic signal at the Intersection.

[30] On the planning side, the details of the US 231 Project were still under consideration when the 2010 Study was performed. Neither the US 231 Project

[8] As part of their response in opposition to INDOT's motion for summary judgment, the Jurichs introduced an affidavit of engineer Fred Hanscom. *Appellants' App. Vol. 2* at 144-47. In his initial affidavit, Hanscom stated that Cumberland's predicted ADT volume for the westbound lane was 3,200; however, he mistakenly said that Cumberland's eastbound ADT volume was 4,100. *Id*. at 146. The Jurichs insisted, during the October 18, 2017 summary judgment hearing, that 4,100 was the correct ADT volume. Even so, on November 6, 2017, they filed a motion to substitute Hanscom's affidavit with a corrected affidavit, which set forth the estimated ADT volume for eastbound Cumberland as 1,400 and not 4,100. *Appellee's App. Vol. 2* at 19. Together, the eastbound and westbound lanes had a minimum ADT volume of 4,600.

nor the Cumberland Project had commenced construction. As such, INDOT had to use *predicted* ADT volume to assess the need for a temporary traffic signal at the Intersection. In recognition that even a conscientious prediction can be flawed, the Manual states that a temporary traffic signal can be placed in operation until proper data and experience can be obtained. *Appellants' App. Vol. 3* at 133. The Manual, therefore, requires that an engineering study be conducted after six months but before one year of operation "to determine if the traffic signal is needed and should become permanent." *Id*. When a traffic study finds that a signal is not justified, it shall be removed immediately. *Id*. We find this legislative scheme, which reflects the legislature's understanding that INDOT may be mistaken in its initial determination regarding the placement of a temporary traffic signal, reveals the legislature's intent to keep INDOT immune from liability for any negligence that arises from the presence or absence of a temporary traffic signal, when that determination was based on INDOT's good faith prediction of ADT volumes. *See Beloat*, 50 N.E.3d at 138 ("The ultimate consideration is whether the action is one that was intended to be immune . . . ."). Shielding INDOT from immunity for its initial good faith prediction of ADT volume, and resultant conclusion that the Manual prohibits the installation of a temporary traffic signal, is just the type of decision that "cannot be assessed by tort standards." *Lee*, 75 N.E.3d at 526.

[31]     The Jurichs recognize that discretionary function immunity "'avoids inhibiting the effective and efficient performance of governmental duties.'" *Appellant's Br*. at 19 (quoting *Peavler*, 528 N.E.2d at 44). Furthermore, "policy-making

activities lie at the heart of governance and such essential acts should not be subject to judicial second-guessing or harassment by the actual or potential threat of liability litigation." *Id*. (quoting *Peavler*, 528 N.E.2d at 44). The *Peavler* court noted, "Tort immunity for basic planning and policy-making functions is necessary to avoid the chilling effect on the ability of the government to deal effectively with difficult policy issues which it confronts daily." *Peavler*, 528 N.E.2d at 44. Under the specific facts of this case, we find INDOT's decision to not install a temporary traffic signal was a discretionary function and, therefore, immune under the ITCA.

### *B. Negligence*

[32] Recognizing that INDOT's actions fall close to the planning/operational line, we note that, even without immunity, the designated facts do not support a claim that INDOT was negligent. To prevail on a negligence claim, a plaintiff must establish three elements: "(1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by the breach of that duty." *F.D.*, 1 N.E.3d at 142. A defendant may obtain summary judgment in a negligence action when the undisputed facts negate at least one element of the plaintiff's claim. *Id*. Whether a defendant owes a duty of care to a plaintiff is generally a question of law for the court to decide. *Chandradat*, 830 N.E.2d at 908.

[33] Governmental entities have a general duty to exercise reasonable care in designing, constructing, and maintaining highways for the safety of public

users.  *Brown v. City of Indianapolis*, 113 N.E.3d 244, 250 (Ind. Ct. App. 2018).
The Jurichs were part of the traveling public.  Furthermore, by statute, INDOT
had the duty to follow the Manual.  I.C. § 9-21-4-1.  While the Manual is not a
legal basis for a statutory negligence action, it is evidence bearing upon the
general duty to exercise reasonable care.  *Chandradat*, 830 N.E.2d at 909.

[34]  In their complaint, the Jurichs maintained that INDOT breached its duty of
care by "failing to properly conduct a traffic study in a timely and appropriate
manner and by failing to erect a traffic control signal at the Intersection."[9]
*Appellants' App. Vol. 2* at 57, 58, 59.  With its motion for summary judgment,
INDOT designated the 2010 Study, which showed that the minimum ADT
volume requirements under Warrant 1 were not met.  *Id*. at 95.  Without the
minimum ADT volume, the Manual prevented INDOT from installing a
temporary traffic signal at the Intersection.  *Appellants' App. Vol. 3* at 133
("Temporary traffic signals may be installed at new intersections on predicted
hourly vehicular volumes, *providing the predicted volumes meet the prescribed
minimum vehicular volume levels* as noted in Condition A or Condition B of
TABLE 4C-1.") (emphasis added).  In his interrogatory, Smith stated that he
was one of the individuals who had worked on the 2010 Study and verified that
the Manual's guidelines for traffic signal analysis had been followed.  *Appellants'*

[9] The Jurichs contend that INDOT had:  (1) a duty to install a temporary traffic signal; (2) a duty to properly design the intersection; and (3) a duty to properly conduct a traffic study.  *Appellant's Reply Br*. at 5.  While apparently distinct, the Jurichs' arguments regarding the Intersection's design and traffic study, arise only in the context of whether INDOT was negligent when it did not install a temporary traffic signal at the Intersection.

*App. Vol. 2* at 102. Smith confirmed that the "[a]ppropriate projected traffic volumes did not exist for US 231 and Cumberland for signal criteria to be met." *Id*. at 102.

[35] The Jurichs' response to INDOT's motion for summary judgment focused on their claim that INDOT had been negligent in using incomplete data as part of its traffic study. A temporary traffic signal can be installed only when Warrant 1 is satisfied.[10] To support its claim that the study was flawed, and a temporary traffic signal should have been installed at the Intersection, the Jurichs designated an affidavit of engineer Fred Hanscom ("Hanscom"). In the affidavit, Hanscom stated that INDOT was negligent when it did not consider an ADT volume of 4,100 for the eastbound approach. *Appellants' App. Vol. 2* at 146. If correct, that predicted ADT volume, when added to the westbound approach would have satisfied Warrant 1's minimum ADT volume to allow INDOT to consider the installation of a temporary traffic signal. However, before the trial court could rule on the motion for summary judgment, the Jurichs substituted Hanscom's affidavit. In the revised affidavit, Hanscom corrected the ADT volume from 4,100 to 1,400. *Appellee's App. Vol. 2* at 19. With this change, the minimum ADT volume was not met, and pursuant to the Manual, Warrant 1 was not satisfied. INDOT was, therefore, barred from placing a temporary traffic signal at the Intersection. Accordingly, the Jurichs

---

[10] See our discussion in Section II of this opinion.

did not meet their burden of showing that a genuine issue of material fact precluded summary judgment in favor of INDOT.

## II. Motion to Correct Error

[36] The Jurichs next argue that the trial court erred in denying their motion to correct error pursuant to Trial Rule 59(A)(1). In that motion, the Jurichs asked the trial court to vacate its summary judgment order to allow the Jurichs to "conduct additional discovery and submit additional evidence in response to INDOT's motion for summary judgment." *Appellants' App. Vol. 3* at 79.

[37] "Indiana courts have long viewed motions under Trial Rule 59(A)(1) with great caution because courts place a high value on finality of judicial resolutions." *Faulkinbury v. Broshears*, 28 N.E.3d 1115, 1122 (Ind. Ct. App. 2015) (internal quotation marks omitted). The decision whether to grant a Trial Rule 59 motion to correct error on the basis of newly discovered evidence "is an equitable one and requires the court to 'balance the alleged injustice suffered by the party moving for relief against the interest of the winning party and society in general in the finality of litigation.'" *Id*. (quoting *Estate of Lee ex rel. McGarrah v. Lee & Urbahns Co.*, 876 N.E.2d 361, 371 (Ind. Ct. App. 2007)). Under Trial Rule 59(A)(1), newly discovered evidence must be material, more than cumulative or impeaching, not privileged or incompetent, shown not to have been discoverable before trial by the exercise of due diligence, and evidence that will reasonably and probably change the outcome. *Otter Creek Trading Co. v. PCM Enviro PTY, LTD*, 60 N.E.3d 217, 227 (Ind. Ct. App. 2016), *trans. denied*.

[38]     The crux of the parties' dispute is whether Warrant 3 (Peak Hour) should have been considered in INDOT's determination of whether a temporary traffic signal should have been installed at the Intersection. The Jurichs contend that the conclusion of Structurepoint Study that Warrant 3 was satisfied is a material fact in this litigation because it goes to whether INDOT was negligent when it did not install the temporary traffic signal. *Appellants' Br*. at 28-30. INDOT responds that, because Warrant 1 is the only warrant that can be considered in the determination of whether to install a temporary traffic signal at a new intersection, the evidence that Warrant 3 was satisfied in the "[Structurepoint] Study was immaterial in addressing whether INDOT breached a duty to the Jurichs." *Appellee's Br*. at 32. From the evidence before us, we agree that Warrant 3 was not material, and the trial court did not err when it denied the Jurichs' motion to correct error.

[39]     The following three documents guide our decision: (1) Smith's affidavit, *Appellants' App. Vol. 3* at 53-56; (2) Kopcha's deposition, *id*. at 136-40; and (3) Hanscom's amended affidavit, *Appellee's App. Vol. 2* at 16-21. INDOT submitted Smith's affidavit as Exhibit A to its response to the Jurichs' motion for sanctions.[11] In his affidavit, Smith stated that he "had the official capacity to determine[,] in conjunction with the [Manual,] the placement of traffic signals for future and existing intersections." *Appellants' App. Vol. 3* at 53. Smith stated

---

[11] The trial court placed its ruling on the motion to correct error "on hold" until INDOT responded to the Jurichs' motion for sanctions. *Tr. Vol. 2* at 81. As such, the trial court was able to consider the motion for sanctions and attached exhibits when it ruled on the motion to correct error.

that Warrant 3 was inapplicable in the determination of whether a temporary traffic signal should be placed at a future intersection. Specifically, he stated:

15. According to the [Manual], in order to place a traffic control signal at an *existing* intersection, a study must he performed in which at least one of nine different warrants are met. The satisfaction of a traffic signal warrant or warrants shall not in itself require the installation of a traffic control signal.

16. According to the [Manual], in order to place a traffic control signal at a *future* intersection, such as Cumberland Avenue and US 231 in as late as April 2014, a study must be performed in which only one of the nine different warrants can be used, Warrant 1. Warrant 3 . . . cannot be used for [] future intersections according to the [Manual]. In fact, Warrant 3 -- Peak Volume [--]was determined to be inapplicable when the [I]ntersection was open for traffic for the following reason: Warrant 3—Peak Volume shall be applied only in unusual cases, such as office complexes, manufacturing plants, industrial complexes, or high-occupancy vehicle facilities that attract or discharge large numbers of vehicles over a short time. It was determined these conditions did not exist at the [I]ntersection of US Highway 231 and Cumberland Avenue . . . when the intersection was opened for traffic.

17. A traffic signal was not installed at the [I]ntersection . . . prior to July 2014 because according to the [Manual] appropriate projected traffic volumes did not exist . . . for signal criteria to be met. This includes Warrant l for the INDOT projected traffic volumes before the intersection opened for traffic and all nine warrants three months after the [I]ntersection was opened for traffic.

*Id.* at 55-56.

INDOT submitted Kopcha's deposition as Exhibit 2 to their response to the Jurichs' motion to correct error. *Id.* at 136-40. In his deposition, Kopcha agreed with Smith's assessment that Warrant 3 could not be used to determine the need for a temporary traffic signal at a future intersection. When asked whether the peak volumes were meant to justify a temporary traffic signal at a new intersection, Kopcha testified:

> The Indiana [Manual] has only Warrant No. 1 for a *provisional* signal, so based on *forecasted* values. There's only Warrant No. 1, and for Warrant No. 1, there's two tables that you can use, and so the table that I choose is the daily volume of traffic table, but the second table is hourly volumes, that you need to meet it for 8 hours.

*Id.* at 139 (emphasis added). While recognizing that peak volumes can be used to determine whether a traffic signal should be installed at an *existing* intersection, Kopcha made clear that the Manual specifies the use of Warrant 1 when "forecasted values" are used to determine the need for a temporary traffic signal at a *new* intersection. *Id.* at 139. Smith's and Kopcha's sworn statements established that Warrant 3 was inapplicable to the determination of whether a temporary traffic signal could be installed at the new Intersection.

[41] The Jurichs provided no evidence to challenge Smith's and Kopcha's statements that only one of the nine warrants, Warrant 1, can be used in the analysis of whether to place a temporary traffic signal at a future intersection. In fact, the Jurichs' own expert, Hanscom, concurred with Smith and Kopcha that only Warrant 1 can be considered in such a study. In his amended

affidavit, Hanscom stated that he was "familiar with the standards of care that pertain to highway design; specifically, the safety precautions needed for motorists to navigate an intersection such as [the Intersection]." *Appellee's App. Vol. 2* at 17. Hanscom was also familiar with "the appropriate standard of care for traffic control signal analyses." *Id.* at 18.

[42] In paragraph 7 of his affidavit, Hanscom confirmed that Section 4C.02 of the Manual, i.e., Warrant 1, allows temporary traffic signals to be installed at *new* intersections on predicted ADT volumes, "*providing* the predicted volumes meet the prescribed minimal levels as noted in Condition A1 or Condition B1"[12] of Table 4C-2. *Id.* (emphasis added). Here, the major street, US 231, and the minor street, Cumberland, each had two or more lanes approaching the Intersection. Under Condition A1 of Warrant 1, a temporary traffic signal could be justified if US 231 had a predicted minimum ADT volume of 10,000 and Cumberland had a predicted ADT volume of 6,000. Hanscom testified that US 231 had an ADT volume of 12,250 and Cumberland had an ADT volume of 4,600. *Id.* at 19. Even by Hanscom's own calculation, there was no justification under the Manual for a temporary traffic signal to be installed at the Intersection.[13]

---

[12] The ADT volume for US 231, as the major street, was 12,250—a number that did not reach the Condition B1 minimum of 12,500, regardless of the number of approach lanes. Here, Condition B1 was clearly not met.

[13] A temporary traffic signal may be installed at an intersection where the major street has *two* or more approach lanes, with an ADT volume of 10,000, and the minor street has just *one* approach lane with an ADT volume of 4,600. While Hanscom understood that US 231 had an ADT volume of 12,250 and that

[43] The trial court found INDOT "ha[d] demonstrated that Warrant 3 applied only to existing roadways and not to future roadways." *Appellants' App. Vol. 2* at 48. As such, the trial court concluded that (1) the Structurepoint "[S]tudy upon which [the] Jurichs rely is not material since it did not apply to the intersection at issue"; and (2) the newly discovered evidence did not lead the trial court to an outcome different than the one it reached in its January 23, 2018 order. *Appellants' App. Vol. 2* at 48. The trial court did not abuse its discretion when it denied the Jurichs' motion to correct error on the basis of the newly discovered evidence.

## III. Motion to Reconsider Sanctions

[44] The Jurichs next contend that the trial court abused its discretion by rescinding its previous order that required INDOT to pay attorney fees as a sanction for the alleged discovery violation of not producing the Structurepoint Study and the related 2011 email communications pertaining to whether a temporary traffic signal should be placed at the Intersection.

[45] A party may seek discovery sanctions against another party under Indiana Trial Rule 37. *See Outback Steakhouse of Fla., Inc. v. Markley*, 856 N.E.2d 65, 82 (Ind. 2006). The purpose of discovery sanctions is twofold; sanctions are intended to be punitive and to deter others from engaging in similar conduct. *Nagel v. N.*

Cumberland had an ADT volume of 4,600, he misunderstood the configuration of the Intersection and believed that Cumberland had just one approach lane. From this, Hanscom incorrectly concluded that Condition A1 of Warrant 1 had been met.

*Ind. Pub. Serv. Co.*, 26 N.E.3d 30, 39 (Ind. Ct. App. 2015), *trans. denied*.

However, there are exceptions to the imposition of sanctions. First, under Rule 37(D), even though the trial court "shall require the party failing to act . . . to pay the reasonable expenses, including attorney's fees, caused by the failure," such requirement is lifted when that failure to act was substantially justified or the circumstances make an award of expenses unjust. Second, under Rule 37(E), "[a]bsent exceptional circumstances," a court may not impose sanctions on a party "for failing to provide electronically stored information lost as a result of the routine, good faith operation of an electronic information system."

[46] The following pertinent evidence was before the trial court when it considered the Jurichs' motion for sanctions. American Structurepoint prepared its study for Tippecanoe County in connection with a local highway safety improvement project for Cumberland Avenue. The Cumberland Project was a federally funded Local Partnership agreement with Tippecanoe County; INDOT had minimal involvement and only served as a pass-through entity for federal funds to the County. *Appellants' App. Vol. 3* at 122. INDOT provided no state money for the Cumberland Project. *Id.* The Structurepoint Study analyzed Warrant 1 and Warrant 3 and found that only Warrant 3 was satisfied. However, as discussed in the previous section, Warrant 3 is not pertinent to an analysis of the need for a temporary traffic signal at a specific intersection. The trial court also considered statements in Smith's deposition that it was INDOT's internal policy to remove from the system emails that were more than three years old. *Id.* at 59, 60. The emails at issue were dated from May through December

2011, and the one that contained a page of the Structurepoint Study was dated May 17, 2011 and addressed to Opal Kuhl. *Id.* at 84-93 The trial court recognized that INDOT policy required the agency to purge the 2011 emails and that the Structurepoint Study may not have been in INDOT's possession. Even so, the trial court "was not persuaded that INDOT should be entirely free from sanctions for its failure to at least acknowledge and disclose it had prior communications with Tippecanoe County officials. *Appellants' App. Vol. 2* at 49-50. Accordingly, the trial court imposed sanctions against INDOT.

[47] In February 2018, INDOT filed its motion to reconsider sanctions, claiming that the study was not material, that the failure to disclose the Structurepoint Study was inadvertent, and the Structurepoint Study was protected from disclosure by federal law under 23 United States Code section 409. *Appellee's Br.* at 25-26 (citing *Appellants' App. Vol. 3* at 112-20). Section 409 provides:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of . . . developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

23 U.S.C. § 409. Congress created this privilege "to foster the free flow of safety-related information between the railroad industry and its regulatory bodies by precluding the possibility that such information would be

discoverable and admissible in civil suits." *Madden v. Ind. Dep't of Transp.*, 832 N.E.2d 1122, 1128 (Ind. Ct. App. 2005). We find the same rationale for barring discovery applies to government entities that request federal-aid funds to construct highway improvement projects.

[48] While recognizing that INDOT was raising this federal discovery law for the first time, the trial court still considered the merits of INDOT's claim. First, the trial court determined that, since the Structurepoint Study was prepared in connection with the federally funded Cumberland Project, the federal bar to discovery applied to the Structurepoint Study. *Appellants' App. Vol. 2* at 50. Second, the trial court determined that the Structurepoint Study was not material because, as we discussed above, the Structurepoint Study's report that Warrant 3 had been satisfied, was not material to the Jurichs' claim of INDOT's negligence. These factors compelled the trial court to reconsider its earlier award of sanctions, and finding that the previous sanctions were improper, the trial court vacated those sanctions.

[49] "We vest trial courts with wide discretion in dealing with discovery matters and will reverse a trial court's decision regarding discovery only for an abuse of discretion." *N. Ind. Pub. Serv. Co. v. Aqua Envtl. Container Corp.*, 102 N.E.3d 290, 300 (Ind. Ct. App. 2018). The trial court initially granted sanctions, believing that the disclosure of the communications could have led the Jurichs to find evidence helpful to their case. The Structurepoint Study found that Warrant 3 was satisfied. Warrant 3, however, was not material to the question of whether INDOT should, or even could, place a temporary traffic signal at the

Intersection. The 2011 emails, which were sent after the Structurepoint Study, emphasized that a warrant analysis was the "critical piece." *Appellant's App. Vol. 3* at 87. Even after the Jurichs knew about Tippecanoe County's involvement, no additional study came to light. The Structurepoint Study and the 2011 emails, if found during discovery and if discoverable under federal law, would not have been material to the Jurichs' case. Vesting courts with wide discretion in dealing with discovery matters, we find the trial court did not abuse its discretion when it vacated its prior order for sanctions.

[50] Affirmed.

Riley, J., and Robb, J., concur.